# Illinois Official Reports

## Appellate Court

***In re B'Yata I.*, 2013 IL App (2d) 130558**

| | |
|---|---|
| Appellate Court Caption | *In re* B'YATA I., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Kenyatta B., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-13-0558 |
| Filed | November 20, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where the evidence that respondent's parental unfitness was not "overwhelming and undisputed," and the trial court did not set forth a factual basis for its determination that respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to her child's welfare, the appellate court retained jurisdiction and entered a limited remand strictly for the entry of an express factual basis supporting the trial court's finding of unfitness and transmission of that factual basis to the appellate court within 28 days of the appellate court's decision. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 09-JA-124; the Hon. Mary Linn Green and the Hon. Patrick L. Heaslip, Judges, presiding. |
| Judgment | Remanded. |

| Counsel on Appeal | Nicholas O. Meyer, of Meyer & Horning, P.C., of Rockford, for appellant. |
|---|---|
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Jay Paul Hoffmann, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. Justices Hutchinson and Schostok concurred in the judgment and opinion. |

## OPINION

¶ 1     In May 2013, the circuit court of Winnebago County found respondent, Kenyatta B., to be an unfit parent with respect to her minor daughter, B'yata I., on three separate grounds. The court later concluded that the termination of respondent's parental rights was in B'yata's best interests. On appeal, respondent challenges the findings of the trial court with respect to both unfitness and best interests. For the reasons set forth below, we remand this cause for further proceedings.

¶ 2                                         I. BACKGROUND

¶ 3     B'yata was born to respondent on September 26, 2008. On March 27, 2009, the State filed a five-count petition alleging that B'yata was a neglected minor. 705 ILCS 405/2-3 (West 2008). The petition was amended on April 1, 2009. Both the original and amended petitions named Bernard I. as B'yata's father.[1] Respondent is also the mother of two other minors, Amashaneek T. and Alishawan T., who were fathered by a different man, Jesse T.[2] Respondent waived her right to a hearing on whether there was probable cause to believe that

[1]DNA testing subsequently excluded Bernard as B'yata's father. Respondent later named Michael G. as a potential father. After DNA testing confirmed that Michael is B'yata's father, the State sought to terminate Michael's parental rights. The trial court found Michael unfit and concluded that it was in B'yata's best interests that his parental rights be terminated. In a separate appeal, this court affirmed the trial court's findings. See *In re B'yata I.*, 2013 IL App (2d) 130492-U.

[2]Amashaneek and Alishawan were subject to separate neglect petitions. Neither of their cases, however, is part of this appeal.

B'yata was a neglected minor, and the trial court, Judge Patrick L. Heaslip, granted temporary guardianship and custody of B'yata to the Illinois Department of Children and Family Services (DCFS). DCFS placed B'yata with relatives.

¶ 4 Following an adjudicatory hearing in September 2009, the trial court found B'yata neglected based on count III of the State's petition, which alleged that B'yata's environment was injurious to her welfare in that her parents engaged in domestic violence in her presence, thus placing her at risk of harm. 705 ILCS 405/2-3(1)(b) (West 2008). In a dispositional order entered in December 2009, the trial court found it in B'yata's best interests that she be made a ward of the court. The court placed custody and guardianship of B'yata with respondent. The court also placed custody and guardianship of Amashaneek and Alishawan with respondent. The dispositional order required respondent to, *inter alia*, remain drug and alcohol free. At that time, the trial court appointed Court Appointed Special Advocates (CASA) as guardian *ad litem* for all three minors.

¶ 5 At a review hearing in January 2010, Keith Tabor, the caseworker then assigned to respondent's case, noted that all three minors were residing with respondent, they were "[d]oing well," and they were all developmentally on target. Tabor testified that a service plan had been established for the case. Among other things, the service plan required respondent to undergo random urine drops and domestic-violence counseling. Tabor stated that respondent had begun domestic-violence counseling and that she had completed a urine drop in January 2010, which was negative. The next review hearing was held on April 27, 2010. By that time, a different caseworker, Amelia Hernandez, was assigned to the case. Hernandez noted that B'yata and her half-siblings still resided with respondent and that the minors were "doing good" in respondent's care. Hernandez noted that respondent was participating in domestic-violence counseling, she was on a waiting list for "WAVE" counseling, and her drug screenings had been negative.

¶ 6 At a hearing on October 19, 2010, Hernandez reported that the minors were "doing great" in respondent's custody and that respondent had completed all required services. Hernandez stated that she had no concerns "whatsoever" about respondent's ability to protect the minors. Hernandez recommended that the case be closed. However, because of CASA's concerns regarding unsupervised contact between Bernard and the family, the court ordered that all previous orders would remain in effect. At a hearing on January 25, 2011, CASA recommended that the case be closed. The trial court, Judge Mary Linn Green, discharged CASA and continued the matter for possible closure.

¶ 7 However, on May 20, 2011, the State filed a motion to modify guardianship and custody of the three minors. In the motion, the State alleged that respondent was arrested for domestic battery on May 18, 2011, with the victim being Amashaneek. The State further alleged that this incident occurred in the presence of the other minors and that respondent failed to remain free of alcohol as required by the dispositional order entered in December 2009. The State requested that guardianship and custody of all three minors be transferred to DCFS. The same day, the trial court reappointed CASA. The parties waived their rights to a temporary-shelter-care hearing. The trial court granted temporary guardianship and custody of Amashaneek and Alishawan to Jesse. The court granted temporary guardianship and

custody of B'yata to DCFS, with discretion to place her with a responsible relative or in traditional foster care. In addition, respondent was ordered to remain free of all illegal drugs and alcohol and to submit to random urine drops upon 24 hours' notice.

¶ 8        On July 15, 2011, the trial court heard and granted the State's motion to modify guardianship and custody. On the same date, the court entered a dispositional order granting legal custody of B'yata to DCFS, with discretion to place her with a responsible relative, in traditional foster care, or with Jesse. The same order granted Jesse legal guardianship and custody of Amashaneek and Alishawan. In addition, the court again ordered respondent to remain drug and alcohol free and to submit to random urine drops upon less than 24 hours' notice. DCFS eventually placed B'yata with Jesse.

¶ 9        A permanency review hearing was scheduled for August 18, 2011, but was continued due to the illness of one of the attorneys. Meanwhile, on September 1, 2011, respondent pleaded guilty to aggravated battery of a child (720 ILCS 5/12-4.3 (West 2010)), based on the May 18, 2011, incident, and was sentenced to probation. On September 9, 2011, the court closed the case as to the two older children. At that time, Jesse was granted permanent legal custody and guardianship of Amashaneek and Alishawan. The court continued the matter as to B'yata for a permanency review hearing on March 6, 2012.

¶ 10       At the March 6, 2012, hearing, respondent was represented by an attorney, but she herself did not appear. At the hearing, caseworker Amber Rasmussen testified that she had been assigned to B'yata's case since July 2011. At that time, B'yata's goal was return home within 12 months. Rasmussen testified that B'yata had resided with Jesse and his wife, Aretha, since May 2011, and that all of B'yata's needs were being met. Rasmussen testified that respondent was entitled to supervised visitation and required to arrange visits through the agency. Rasmussen initially testified that respondent last visited B'yata on September 26, 2011. She later clarified that respondent "stopped by for Christmas, too." Rasmussen stated that respondent had not provided her with proof that she had completed a drug assessment and had not completed any of the requested drug screens as required by the service plans. Rasmussen acknowledged that respondent was not provided with a copy of the current service plan. She explained that she had intended to provide the service plan to respondent at a family-team meeting. Rasmussen scheduled two such meetings, one in December 2011 and one in January 2012, but respondent did not show up to either meeting. Rasmussen indicated, however, that she communicated to respondent by telephone that she needed to complete a drug assessment. During the hearing, the trial court noted that Rasmussen had submitted a report to the court. The court stated that it did not find the report "very thorough." The court pointed out that the report did not reference the dates that the agency tried to contact respondent or when she was asked to do the urine drops and that it did not include a copy of the service plan. Based on the foregoing, the court found that respondent failed to make reasonable efforts. The court also found that DCFS failed to make reasonable efforts. The court set the permanency goal at return home within 12 months. The case was continued to April 5, 2012, for a status report as to the efforts of DCFS. On that date, the court found that DCFS was making reasonable efforts.

¶ 11　　In June 2012, respondent was sentenced to two years' incarceration for probation violations and a new felony charge of failure to register as a violent offender against youth (730 ILCS 154/30 (West 2012)). At the next permanency review hearing, which was held on September 4, 2012, the court was informed that respondent was absent due to her incarceration. Rasmussen testified that B'yata was doing well with the foster parents. She recommended changing the permanency goal to substitute care pending termination of parental rights. Rasmussen noted that she had not had any contact with respondent since her incarceration. The court found that respondent had not made reasonable efforts or reasonable progress and, based on respondent's lack of progress, her incarceration, and the length of time the case had been pending, it adopted Rasmussen's recommendation to change the permanency goal.

¶ 12　　On November 28, 2012, the State filed a motion for termination of respondent's parental rights, which was amended on December 6, 2012. The amended motion alleged four counts of unfitness. Count I alleged that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to B'yata's welfare. See 750 ILCS 50/1(D)(b) (West 2012). Count II alleged that respondent had failed to protect B'yata from conditions within the environment injurious to her welfare. See 750 ILCS 50/1(D)(g) (West 2012). Count III alleged that respondent was depraved.[3] See 750 ILCS 50/1(D)(i) (West 2012). Count IV alleged that respondent had failed to make reasonable progress toward B'yata's return to her within any nine-month period following the first nine-month period after B'yata's adjudication as a neglected minor. See 750 ILCS 50/1(D)(m)(iii) (West 2012). With respect to count IV, the State specified the following "nine-month" periods: (1) November 1, 2010, to July 1, 2011, and (2) May 17, 2011, to March 17, 2012.

¶ 13　　The unfitness phase of the termination proceeding commenced on January 24, 2013. At that hearing, Officer Sean Welsh of the Rockford police department testified that on May 18, 2011, he responded to a report of a mother "battering" her children. When Officer Welsh arrived, he observed respondent with two children. Rasmussen was then called to lay a foundation for the service plans. Rasmussen identified service plans dated May 12, 2009, July 21, 2009, August 18, 2009, September 10, 2009, May 12, 2010, March 4, 2011, November 2, 2011, April 26, 2012, and November 19, 2012. Those service plans were admitted into evidence and the case was continued to April 3, 2013.

¶ 14　　When the hearing resumed, Rasmussen was recalled and she testified that since the last court date respondent had been released from jail and had contacted Rasmussen to set up visitation with B'yata. Rasmussen testified that respondent had since visited B'yata twice, on March 22 and March 29, 2013. Rasmussen testified that she supervised the one-hour visit on March 22 and that respondent's behavior was appropriate. Following Rasmussen's testimony, the State moved to admit People's exhibits 13 through 15 and 22 through 24. People's exhibit 13 is a certificate reflecting that on September 1, 2011, respondent was

---

[3]The trial court subsequently granted the State's motion to dismiss count III of the amended motion, and it is not at issue on appeal.

convicted of aggravated battery of a child. People's exhibit 14 is a certificate reflecting that on June 26, 2012, respondent was convicted of failure to register as a violent offender against youth. People's exhibit 15 is a certificate reflecting that on August 4, 2010, respondent was convicted of attempted forgery. See 720 ILCS 5/8-4, 17-3 (West 2010). People's exhibit 22 consists of the bill of indictment, guilty plea, and probation order related to respondent's conviction of aggravated battery of a child. People's exhibit 23 consists of the bill of indictment, guilty plea, and sentence related to respondent's conviction of failure to register as a violent offender against youth. People's exhibit 24 is the information, guilty plea, and conditional discharge order related to respondent's conviction of attempted forgery. The trial court granted the State's motion to admit these exhibits.

¶ 15        Respondent testified that she had been incarcerated from May 18, 2011, through May 27, 2011, and from March 14, 2012, through February 28, 2013.[4] Respondent testified that in April 2012 she received a service plan from Rasmussen requiring her to complete a drug and alcohol assessment and to participate in parenting classes, an anger management program, and domestic-violence counseling. Respondent stated that she completed all of the required services except for anger management. Respondent testified that she participated in a three-month drug and alcohol assessment program and in November 2012 presented Rasmussen a letter evidencing her participation in the program. She acknowledged that, to receive a certificate in the program, she would have had to complete a six-month program. Respondent stated that she could not complete a six-month program, because she was scheduled to be released from prison before she could do so. Respondent further testified that she completed parenting classes while incarcerated and presented evidence of such to Rasmussen in November 2012 and that she began domestic-violence counseling in September 2012. Respondent also noted that she placed her name on a waiting list for anger management while she was incarcerated, but was unable to participate in the program because she was released from prison before it started. Respondent acknowledged that her progress on her service plans was rated unsatisfactory, but she attributed this to the fact that she could not complete the services during the relevant six-month rating period. She explained that she had been incarcerated at multiple facilities and that not all services are available at each prison.

¶ 16        Respondent further testified that she kept in touch with Rasmussen while incarcerated. She stated, for instance, that she wrote to Rasmussen at least twice a month and requested visitation with B'yata. She noted that monthly visits at the prison began in October 2012. During these visits, she and B'yata played with toys, talked, and shared hugs and kisses.

---

[4]With respect to the first period of imprisonment, the probation order admitted into evidence as part of People's exhibit 22 indicates that respondent was actually incarcerated for a period of 107 days for the offense of aggravated battery of a child, presumably from May 18, 2011, the date of the offense, through September 1, 2011, the date respondent pleaded guilty. With respect to the second period of imprisonment, People's exhibit 23 indicates that respondent was taken into custody for failing to register as a violent offender against youth on March 14, 2012, released on March 22, 2012, and taken into custody again on April 24, 2012. She was formally sentenced to two years' imprisonment for that offense on June 26, 2012, and remained incarcerated until February 28, 2013.

Respondent testified that B'yata appeared bonded to her and referred to her as "mommy." Respondent also related that she kept in touch with B'yata in other ways while in prison. She sent B'yata two letters a week and spoke to B'yata by telephone about five times. In addition, respondent testified that she asked Aretha about B'yata's progress in school and her medical appointments. Respondent testified that in November 2012 she was scheduled to participate in an administrative case review via telephone, but communication problems prevented her from doing so. Respondent stated that she wrote Rasmussen a letter about the incident and tried to file an appeal. However, Rasmussen did not receive the letter until after the time for filing the appeal had expired. Respondent testified that, since being released from prison, she had had phone contact with B'yata approximately twice a week.

¶ 17     On cross-examination, respondent noted that B'yata was initially removed from her care in March 2009, as a result of domestic violence, and remained in foster care until December 2009, when custody of B'yata was returned to her. Respondent acknowledged that B'yata was removed from her care a second time, in May 2011, because of a domestic-violence incident involving herself and Amashaneek, which resulted in respondent's conviction of aggravated battery of a child. Respondent agreed that, as a result of that conviction, she was required to register as a violent offender against youth and her failure to register resulted in incarceration. Respondent stated that she was aware that, because she was on probation, the commission of a new offense would likely result in her being taken into custody and prevent her from caring for B'yata. Finally, respondent admitted that, between May 2011 and September 2012, she did not pursue domestic-violence counseling, but she stated that she had been "out of custody" during that period of time for "[j]ust a couple of days."

¶ 18     Aretha testified that B'yata lived with her, Jesse, Amashaneek, and Alishawan. Aretha stated that respondent wrote to the children about twice a month. According to Aretha, however, respondent never inquired about B'yata's medical care or her educational welfare. On cross-examination, Aretha acknowledged that in her letters respondent did inquire generally about how the children were doing. She also acknowledged that there was a bond between respondent and B'yata and that B'yata missed her mother.

¶ 19     Following closing arguments, the trial court continued the matter to May 2, 2013, for a decision on unfitness and a possible best-interests hearing. On that date, the court found that the State had proven respondent unfit by clear and convincing evidence pursuant to counts I, II, and IV of the amended motion to terminate parental rights. At the best-interests hearing, which immediately followed, the State asked the court to take judicial notice of the evidence presented at the unfitness phase.

¶ 20     Rasmussen then testified that since June 2011 B'yata has resided in a foster home with Jesse, Aretha, and her two older half-siblings. According to Rasmussen, B'yata has a good relationship with the foster parents, who are willing to adopt her. Rasmussen further testified that B'yata has a close relationship with her half-siblings. B'yata shares a room with Amashaneek and looks up to her as a role model. Rasmussen also noted that B'yata attends church with the foster parents, that she is in preschool, and that the foster parents have attended B'yata's school meetings and conferences. In addition, B'yata has friends at school and in the neighborhood. Rasmussen acknowledged that there was some concern in the foster

home because respondent had named another man as the possible father of Amashaneek and Amashaneek was having some difficulties with this news. Rasmussen recommended counseling for B'yata to help address this matter. In Rasmussen's opinion, B'yata should be freed for adoption so she could have a stable, permanent home where she knows the parents and is a part of a family unit.

¶ 21    On cross-examination, Rasmussen testified that B'yata has a bond with respondent. Rasmussen noted that since October 2012 respondent has regularly visited with B'yata. Further, respondent has spoken with B'yata by telephone through the foster parents, and the foster parents have indicated that they are willing to allow respondent to continue to have contact with B'yata if the adoption is completed. Rasmussen emphasized, however, that even though respondent and B'yata are bonded, she believes that it is in B'yata's best interests that respondent's parental rights be terminated. Rasmussen testified that she did not speak to the foster parents about establishing a guardianship in lieu of adoption.

¶ 22    Respondent testified that she and B'yata have a bond. She noted that, since her release from prison late in February 2013, she has had contact with B'yata by telephone and through letters. Respondent stated that she would be in favor of a guardianship so that B'yata could remain with the foster parents until respondent became established. Respondent testified that she resides with her mother and grandfather and that she recently found a job. She stated that she would be willing to participate in any services that the court recommends if it finds that it is not in B'yata's best interests to terminate her parental rights. Respondent acknowledged the aggravated battery of Amashaneek. She stated that to prevent such incidents in the future, she is participating in an anger-management program. She related that she has learned to refrain from "any type of negativity" by removing herself from any confrontational situations.

¶ 23    The State called Jesse as a rebuttal witness. Jesse confirmed that he and Aretha are willing to adopt B'yata. He also opined that it is important for B'yata to have a relationship with her biological mother. He stated that he would allow respondent to visit B'yata after adoption, as respondent would be having contact with the two older children, with respect to whom respondent's parental rights are not being terminated. On cross-examination, Jesse testified that Rasmussen did not discuss a guardianship with him, but he was familiar with such an arrangement because of the other children. Jesse stated that his focus is on what is best for B'yata as an individual, whether it be adoption or guardianship.

¶ 24    Following closing arguments, the trial court announced its decision. The court noted that the focus at the best-interests phase of the proceeding is B'yata and no one else. Noting B'yata's strong bond with her half-siblings and the unusual position that the foster parents have taken in openly agreeing to maintain contact with a biological parent, the court terminated respondent's parental rights. The formal order of termination was entered on May 7, 2013. On May 21, 2013, respondent filed a notice of appeal.

¶ 25                                              II. ANALYSIS

¶ 26    Prior to discussing the arguments respondent raises in her appeal, we address the timeliness of our decision. This case is designated as "accelerated" pursuant to Illinois

Supreme Court Rule 311(a) (eff. Feb. 26, 2010) because it involves a matter affecting the best interests of a child. With respect to such cases, Illinois Supreme Court Rule 311(a)(5) (eff. Feb. 26, 2010) provides in relevant part that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." In this case, respondent filed her notice of appeal on May 21, 2013. Thus, the 150-day period to issue our decision expired on October 18, 2013. We note, however, that on July 25, 2013, respondent filed a motion for an extension of time to file her opening brief. We granted respondent's request and set a revised briefing schedule, allowing respondent until August 22, 2013, to file her brief. Respondent did not file her brief by this date, and on September 6, 2013, we issued an overdue warning letter, notifying respondent that she had seven days to file her brief or her appeal would be dismissed without further notice. Respondent filed her brief on September 13, 2013. Thereafter, we again revised the briefing schedule to allow the State until October 4, 2013, to file its brief, and respondent until October 11, 2013, to file her reply brief. Since this case was not ready for disposition until October 11, 2013, we find good cause for issuing our decision after the 150-day deadline. See *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 732-33 (2006) (noting that granting parties' requests for extension of time to file their briefs allowed the parties the opportunity to develop and present their positions).

¶ 27      Turning to the merits, respondent raises three arguments on appeal. First, she contends that this case should be remanded because the trial court failed to make any written or oral findings of fact to support its unfitness determination. Second, she argues that the State failed to prove her unfit by clear and convincing evidence. Third, she asserts that the trial court's finding that it is in B'yata's best interests to terminate her parental rights is against the manifest weight of the evidence. We find the first issue dispositive of this appeal.

¶ 28      A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure. *In re Haley D.*, 2011 IL 110886, ¶ 90; *In re D.R.*, 307 Ill. App. 3d 478, 482 (1999). Accordingly, the Juvenile Court Act of 1987 (Juvenile Court Act) provides a two-stage process for involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2012). Initially, the State must prove that the parent is unfit. 705 ILCS 405/2-29(2), (4) (West 2012); 750 ILCS 50/1(D) (West 2012); *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990); *In re Antwan L.*, 368 Ill. App. 3d 1119, 1123 (2006). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2-29(2) (West 2012); *In re Adoption of Syck*, 138 Ill. 2d at 277; *In re Antwan L.*, 368 Ill. App. 3d at 1123.

¶ 29      With respect to the first stage of the termination process, section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2012)) lists various grounds under which a parent may be found unfit. *In re Antwan L.*, 368 Ill. App. 3d at 1123. The State has the burden of proving a parent's unfitness by clear and convincing evidence. 705 ILCS 405/2-29(2), (4) (West 2012); *In re Antwan L.*, 368 Ill. App. 3d at 1123. A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make. *In re Tiffany M.*, 353 Ill. App. 3d 883, 888-89 (2004). As such, a trial court's determination of a parent's unfitness will not be reversed unless it is contrary to the manifest weight of the

evidence. *In re Brianna B.*, 334 Ill. App. 3d 651, 655 (2002). A decision is against the manifest weight of the evidence "if a review of the record 'clearly demonstrates that the proper result is the one opposite that reached by the trial court.' " *In re Brianna B.*, 334 Ill. App. 3d at 656 (quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 30        Respondent initially asserts that the trial court failed to make any specific findings of fact to support its determination that she was an unfit parent. Respondent argues that, when a trial court fails to make findings of fact, there is no basis for the reviewing court to determine whether the trial court's finding of unfitness is against the manifest weight of the evidence. As such, she urges us to remand the matter to the trial court with instructions to enter an express factual basis for its findings of unfitness. In support of her position, respondent cites principally to *In re Abel C.*, 2013 IL App (2d) 130263, and *In re Madison H.*, 215 Ill. 2d 364 (2005). As respondent readily concedes, however, neither *In re Madison H.* nor *In re Abel C.* concerned a finding of unfitness at a termination proceeding.

¶ 31        In *In re Madison H.*, the supreme court interpreted section 2-27(1) of the Juvenile Court Act (705 ILCS 405/2-27(1) (West 2002)). That provision relates to the placement of a minor following a dispositional hearing, and it expressly requires the trial court to put "in writing" the factual basis for its determination. 705 ILCS 405/2-27(1) (West 2002); *In re Madison H.*, 215 Ill. 2d at 374. The *In re Madison H.* court held that oral findings set forth by a trial court during a dispositional hearing, to the extent that they are explicit and advise the parties of the basis for the court's decision, satisfy the purpose of the writing requirement, which is to "give the parties notice of the reasons forming the basis for the removal of the child and to preserve this reasoning for appellate review." *In re Madison H.*, 215 Ill. 2d at 374-77. In *In re Abel C.*, this court interpreted section 2-21(1) of the Juvenile Court Act (705 ILCS 405/2-21(1) (West 2010)), which requires written findings of fact in neglect proceedings. Noting that neither the written order of adjudication nor the trial court's oral pronouncement provided any factual basis for the trial court's finding of neglect, we concluded that without clear and sufficient findings of fact we could not properly review the trial court's decision. *In re Abel C.*, 2013 IL App (2d) 130263, ¶¶ 20-22. As a result, we retained jurisdiction of the appeal and entered a limited remand requiring the trial court to provide an express factual basis supporting its finding of neglect. *In re Abel C.*, 2013 IL App (2d) 130263, ¶ 22.

¶ 32        Unlike the statutes involved in *In re Madison H.* and *In re Abel C.*, respondent does not direct us to any provision requiring the trial court to put "in writing" the factual basis for its parental unfitness determination at a termination proceeding. However, respondent does note that in *In re G.W.*, 357 Ill. App. 3d 1058 (2005), we admonished trial courts to set forth a factual basis for a finding of unfitness. In that case, the respondent mother challenged the trial court's finding that she was an unfit parent. We emphasized that, to determine whether a trial court's finding of unfitness is against the manifest weight of the evidence, the appellate court must be able to review both the evidence presented and the trial court's findings of fact. *In re G.W.*, 357 Ill. App. 3d at 1060. We then stated:

            "[T]he trial court in this case has failed to enter findings of fact. After hearing the
            testimony of more than 10 witnesses over a period of approximately nine months, the
            trial court made no findings of fact in either its oral statement at the end of the fitness

hearing or in its written order. While we grant great deference to the trial court's findings of fact, our review is made more difficult when no such findings are made and only a blanket finding of 'proven' is pronounced. We cannot review or defer to something that was never made; therefore, we admonish trial courts to pay particular attention to making findings of fact so that meaningful review of the ultimate curtailment of parental rights is given." *In re G.W.*, 357 Ill. App. 3d at 1060.

Ultimately, we vacated and remanded, not because of the trial court's lack of factual findings on unfitness, but because of other errors by the trial court. *In re G.W.*, 357 Ill. App. 3d at 1061-62.

¶ 33    Although not cited by the parties, in *In re Richard H.*, 376 Ill. App. 3d 162 (2007), the court addressed whether the trial court's failure to make either oral or written findings of fact concerning parental unfitness required reversal. There, the State alleged that the respondent was unfit based on three separate grounds, including the failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. The trial court found that the State presented clear and convincing evidence of the respondent's unfitness on each allegation. However, no findings of fact were set forth in either the trial court's oral pronouncement or its written order. The *In re Richard H.* court noted that, while specific findings of fact are preferable, the ruling in *In re G.W.* does not stand for the proposition that the lack of such findings requires reversal in every case. *In re Richard H.*, 376 Ill. App. 3d at 166. The court concluded that its review was not impeded by the lack of factual findings because the evidence was "overwhelming and undisputed" that the respondent's inability to tackle her drug addiction prevented her from taking responsibility for the care and custody of her children. *In re Richard H.*, 376 Ill. App. 3d at 164-66.

¶ 34    Turning to the facts of the case before us, we agree with respondent that the trial court did not set forth a factual basis to support its finding that respondent is unfit to parent B'yata. In announcing its decision, the trial court merely stated that it had considered "all of the evidence, testimony, witness credibility, and arguments of counsel, and finds that the State has met its burden of proof and proven the following by clear and convincing evidence: As to mother[,] *** the State has proved Paragraph 9, Counts 1, 2, and 4." Similarly, the written order declaring respondent unfit merely states, "[respondent] unfit ¶ 9 counts 1, 2 and 4 *** findings by clear and convincing evidence." The question thus becomes whether the trial court's failure to set forth a factual basis prevents this court from conducting a meaningful review of the unfitness finding in this case. We conclude that it does.

¶ 35    As noted earlier, count I of the State's amended motion to terminate respondent's parental rights alleged that respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to B'yata's welfare (750 ILCS 50/1(D)(b) (West 2012)). In assessing a parent's unfitness under this ground, a court considers a parent's efforts to visit and maintain contact with the child, as well as other indicia, such as inquiries by the parent into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Completion of service plans may also be considered evidence of a parent's interest, concern, or responsibility. *In re Daphnie E.*, 368 Ill. App. 3d at 1065; *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000). The court should focus on the parent's efforts, not his or her success. *In re*

*Adoption of Syck*, 138 Ill. 2d at 279. In this regard, the parent's conduct is examined in the context of the circumstances in which that conduct occurred. *In re Adoption of Syck*, 138 Ill. 2d at 278. Thus, circumstances such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are relevant. *In re Adoption of Syck*, 138 Ill. 2d at 278-79. Furthermore, if personal visits with the child are somehow impractical, other methods of communication, such as letters, telephone calls, and gifts can demonstrate a reasonable degree of interest, concern, or responsibility, "depending upon the content, tone, and frequency of those contacts under the circumstances." *In re Adoption of Syck*, 138 Ill. 2d at 279. We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Rather, the interest, concern, or responsibility must be objectively reasonable. *In re Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 36    Here, the evidence shows that the case was pending closure when respondent was arrested on May 18, 2011, for aggravated battery of Amashaneek. Following respondent's arrest, her contact with B'yata was admittedly sporadic, with only two documented visits between September 1, 2011, when she was released from jail, and March 14, 2012, when she was taken into custody for failure to register as a violent offender against youth. However, following her arrest in March 2012, respondent's contacts with B'yata gradually became more consistent. Respondent began corresponding with Rasmussen to inquire about visits with B'yata, and monthly visits were established in October 2012. In addition, respondent kept in touch with B'yata in other ways while incarcerated. According to respondent, she wrote to B'yata twice a week and spoke to B'yata by telephone on at least five occasions. Respondent also testified that she asked Aretha about B'yata's progress in school and her medical appointments. Aretha confirmed that respondent had written to the children on a regular basis, inquiring generally about how the children were doing, but she denied that respondent had inquired about B'yata's health or education.

¶ 37    Moreover, although respondent was rated unsatisfactory on most of the tasks outlined in the service plans drafted after her arrest in May 2011, she nevertheless showed progress. Significantly, in March 2012, respondent contacted Rasmussen to set up a family-team meeting, at which she was provided a copy of the most recent service plan. Respondent recounted that the service plan required her to complete a drug and alcohol assessment and to participate in parenting classes, anger management, and domestic-violence counseling. Respondent testified that she completed parenting classes while incarcerated and presented evidence of such to Rasmussen in November 2012. Respondent also testified that she participated in a three-month drug and alcohol assessment program, began domestic-violence counseling, and placed her name on a waiting list for anger management.

¶ 38    The evidence set forth above is by no means a complete catalog of the evidence presented at the unfitness hearing. Nevertheless, it demonstrates that, unlike in *In re Richard H.*, the evidence regarding whether respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to B'yata's welfare was far from "overwhelming and undisputed." As such, and in light of the trial court's failure to set forth a factual basis for its finding that respondent is unfit for failure to maintain a reasonable degree of interest,

concern, or responsibility as to B'yata's welfare, there is no basis for this court to determine whether the trial court's finding on this ground is against the manifest weight of the evidence. We are mindful, of course, that the trial court found respondent unfit on three independent grounds any one of which, standing alone, could support a finding of unfitness. *In re E.O.*, 311 Ill. App. 3d 720, 726 (2000). We conclude, however, that the determinations on the other grounds of unfitness suffer from similar infirmities.

¶ 39    Count II of the State's amended motion alleged that respondent was unfit for failure to protect B'yata from conditions within the environment injurious to her welfare (750 ILCS 50/1(D)(g) (West 2012)). At the conclusion of the unfitness hearing, the State argued that it had established unfitness as to this ground on the basis of respondent's actions toward Amashaneek on May 18, 2011, which occurred in B'yata's presence and for which respondent pleaded guilty to aggravated battery of a child. Although proof of neglect as to one child might be relevant to the issue of a parent's fitness with respect to another child (see *In re D.F.*, 201 Ill. 2d 476, 500-01 (2002); *In re G.V.*, 292 Ill. App. 3d 301, 307 (1997)), there is no *per se* rule that the neglect of one child conclusively establishes a parent's unfitness toward another child in the same household (see *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004)). In such a case, unfitness based on a failure to protect a minor from conditions within the environment injurious to the minor's welfare should be " 'measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question.' " *In re Arthur H.*, 212 Ill. 2d at 468 (quoting *In re Edward T.*, 343 Ill. App. 3d 778, 797 (2003)). Here, although it was undisputed that respondent pleaded guilty to aggravated battery of Amashaneek, the State does not direct us to any testimonial evidence at the unfitness hearing regarding B'yata's care, condition, or environment on or before May 18, 2011. Moreover, the service plans admitted into evidence at the unfitness hearing suggest that B'yata was doing well in respondent's care. The caseworker wrote, for instance, that B'yata appeared to be well cared for by respondent and that respondent had displayed a desire to ensure that B'yata remains healthy. In other words, the evidence on this ground was also far from overwhelming. We therefore conclude that the lack of a factual basis by the trial court impedes our ability to adequately review the trial court's finding on this ground as well.

¶ 40    Count IV of the State's amended motion alleged that respondent was unfit for failure to make reasonable progress toward B'yata's return to her within any nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(iii) (West 2012)). The statute requires the State to specify the particular nine-month period relied upon. 750 ILCS 50/1(D)(m) (West 2012). In this case, the State identified the following two "nine-month" periods: (1) November 1, 2010, to July 1, 2010, and (2) May 17, 2011, to March 17, 2012. In its brief on appeal, the State appears to abandon this ground of unfitness. The State points out that in the amended motion it "inadvertently listed periods that were not nine months" and therefore did not comply with the time period set forth in the statute. Indeed, the first period identified by the State encompasses only eight months and therefore could not form a basis for unfitness under section 1(D)(m)(iii), which, as noted above, requires an assessment of progress during a nine-month period. The second period consists of 10 months and therefore exceeds the

- 13 -

statutory period by one month. This latter period could potentially provide a basis for a finding of unfitness had the trial court specified the nine-month period upon which it was relying. See *In re R.L.*, 352 Ill. App. 3d 985, 997-98 (2004) (rejecting the respondent's argument that the trial court failed to specify the nine-month period it considered when determining that she had failed to make reasonable progress toward the minor's return where the trial court expressly stated that it had considered the respondent's actions during three consecutive six-month periods). However, because the trial court did not specify the time period upon which it was relying or identify the conduct forming the basis for its determination that respondent failed to make reasonable progress toward B'yata's return, we are unable to meaningfully review the determination.

¶ 41 In short, the evidence in this case regarding respondent's parental unfitness is not "overwhelming and undisputed," yet the trial court failed to set forth any factual basis for its decision. Given these circumstances, we are unable to determine whether the trial court's finding that respondent is unfit is against the manifest weight of the evidence. Accordingly, we are compelled to remand this cause for further proceedings. As we did in *In re Abel C.*, 2013 IL App (2d) 130263, ¶ 22, we retain jurisdiction over this appeal and enter a limited remand, strictly for the entry of the express factual basis supporting the trial court's finding of unfitness, not for the taking of evidence or for additional argument. Consistent with the policy requiring expeditious resolution of matters involving minors (see Ill. S. Ct. R. 311 (eff. Feb. 26, 2010); *In re D.F.*, 208 Ill. 2d 223, 231 (2003)), the trial court shall transmit its factual basis to the clerk of this court within 28 days of this decision. We express no opinion regarding the ultimate outcome of this appeal.

¶ 42 Before concluding, we again emphasize the important interests at stake. Proceedings such as this can result in the permanent and irrevocable termination of a parent's right to raise his or her child. As such, we strongly encourage trial courts to set forth findings of fact in support of any determination that a parent is unfit. See *In re G.W.*, 357 Ill. App. 3d at 1060. Doing so not only facilitates appellate review, but ensures that the minors involved in such cases do not encounter any needless delay in obtaining permanency.

¶ 43                                                    III. CONCLUSION

¶ 44 For the reasons set forth above, this cause is remanded to the circuit court of Winnebago County for further proceedings consistent with this opinion.

¶ 45 Remanded.