NOTICE

Decision filed 06/13/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220104-U

NOS. 5-22-0104, 5-22-0106 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* I.B. and B.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Moultrie County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 18-JA-2, 18-JA-3 |
| | ) | |
| Danielle W., | ) | Honorable |
| | ) | Gary A. Webber, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's finding that the respondent mother was unfit was not against the manifest weight of the evidence. The court's finding that termination of the respondent's parental rights was in the best interest of her children was also not against the manifest weight of the evidence.

¶ 2    The respondent, Danielle W., appeals an order terminating her parental rights to her two children. She argues that (1) the trial court's finding that she was unfit was against the manifest weight of the evidence and (2) the court's finding that termination of her parental rights was in the best interest of the children was likewise against the manifest weight of the evidence. We affirm.

1

¶ 3                               I. BACKGROUND

¶ 4      On March 29, 2018, the respondent's daughters, B.B. and I.B., awoke to find that she was not home. B.B. was nine years old at the time, and I.B. was eight years old. The children were removed from her home that day. In a petition for adjudication of wardship, the State alleged that the respondent had a pipe used for consuming methamphetamine in her home on February 16; that she admitted to using methamphetamine on March 28; and that the children awoke to find her absent from the home on March 29. On April 2, 2018, the court held a shelter care hearing, after which it placed the children in the temporary custody of the Department of Children and Family Services (DCFS).

¶ 5      The case was assigned to DCFS caseworker Melissa Sanborn. In May 2018, Sanborn developed the respondent's first service plan, which required her to undergo substance abuse treatment and submit to random drug tests. The plan also required the respondent to engage in services for victims of domestic violence. We note that although the respondent and the children did not reside with the children's father, Donald B., when the children were removed, the respondent indicated that they were still involved in a romantic relationship. We further note that the father's parental rights were also terminated in these proceedings. However, he is not a party to this appeal.

¶ 6      Sanborn developed subsequent service plans for the respondent in September 2018, March 2019, September 2019, and February 2020. These service plans included the same goals as the first service plan. In addition, they required the respondent to refrain from committing criminal offenses and to obtain stable housing.

2

¶ 7    On January 15, 2019, the court made an adjudication of neglect, finding the allegations in the State's petition for adjudication of wardship to be proven. On February 7, 2019, the court held a dispositional hearing and made the children wards of the court.

¶ 8    In April 2019, the respondent entered a residential substance abuse treatment program at Gateway in Springfield. She completed the program and began the recommended follow-up outpatient treatment; however, she did not successfully complete the outpatient treatment. Instead, she began using methamphetamine again.

¶ 9    In addition, throughout 2018 and 2019, the respondent was arrested and charged with multiple criminal offenses in six different cases. She pled guilty to six felony counts, and she entered the Department of Corrections (DOC) late in December 2019. At that time, she had not successfully completed any of the goals in her DCFS service plans.

¶ 10    Beginning in February 2020, the respondent signed up for substance abuse treatment and for various classes related to her service plan goals. However, she was placed on waiting lists for each of them.

¶ 11    On September 14, 2020, the State filed a motion to terminate the respondent's parental rights. It alleged that the respondent was an unfit parent on four grounds: (1) a failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) a failure to make reasonable efforts to correct the conditions that were the basis for their removal during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(i)); (3) failure to make reasonable progress toward the return of the children during any nine-month period after the adjudication of neglect (*id.* § 1(D)(m)(ii)); and (4) depravity (*id.* § 1(D)(i)). For purposes of the allegations of failure to make both reasonable efforts and reasonable progress, the State identified the relevant periods as January 15, 2019, to

3

October 15, 2019, and October 16, 2019, to April 16, 2020. The State further alleged that termination of the respondent's parental rights was in the best interest of the children.

¶ 12    The unfitness hearing began on January 4, 2021. At the outset, the State asked the court to take judicial notice of the respondent's criminal convictions in six cases. Those cases involved felony charges for possession of methamphetamine on or about January 12, 2018; possession of methamphetamine on or about February 16, 2018; unlawful possession of a stolen vehicle on or about June 7, 2018; burglary on or about November 1, 2018; unlawful possession of a converted vehicle on or about April 3, 2019; and unlawful possession of a stolen vehicle on or about September 25, 2019. The respondent subsequently pled guilty to each of these charges. She was sentenced to probation and accepted into drug court for the first three charges; however, she was sentenced to consecutive prison terms totaling eight years on the last three charges. As stated previously, she was taken into the custody of the DOC late in December 2019.

¶ 13    The first witness to testify was the respondent, who was called by the State. She testified that the children had been with their current foster mother, Betty, since May 2020. Prior to that, they had been in two different placements with relatives.

¶ 14    When asked what she had done up until September 2020, when the motion to terminate was filed, the respondent testified that she completed a drug rehabilitation program at Gateway, for which she received a "certification," and she then did outpatient treatment through Heritage Behavioral Health. She also noted that at some point, she lived at Grace House and was "trying to get help to go like get [her] own place and stuff."

¶ 15    The respondent testified that she got no assistance from her DCFS caseworker. She stated that the caseworker refused to meet with her on multiple occasions. She further testified that there was something she was required to complete within 45 days with the assistance of her caseworker,

4

but it was sent to her at the Moultrie County jail where she had to complete it on her own. We note that she did not specify what this item was, and she was not asked to clarify.

¶ 16    The respondent stated that most of the substance abuse treatment she received was through drug court. She acknowledged that she did not successfully complete the drug court program. However, she testified that this was because she decided to enter a boot camp program instead to avoid accruing additional time. She stated, "I had prior charges that kept coming back while I was on the drug court." She testified, however, that due to the COVID-19 pandemic, she was unable to participate in boot camp.

¶ 17    She testified that limitations on programs resulting from COVID impacted her efforts. When asked if she placed the blame for her failure to complete the required services on the pandemic and on her caseworker, the respondent said, "Yes."

¶ 18    The respondent was asked to address the methamphetamine charge involving the events of February 16, 2018. The assistant state's attorney asked, "What was going on in your life on February 16 of 2018 that resulted in this conviction?" The respondent explained that her house had been raided "for stolen property." She acknowledged that although the police did not find any stolen property, they did observe drug paraphernalia. She indicated that it belonged to someone named Mr. Nichols, but she acknowledged that she did use methamphetamine. She testified that she was not addicted to methamphetamine at that time, but that when the State took her children, it "took [her] only reason for living," and she began to use methamphetamine more frequently.

¶ 19    Under questioning by her own attorney, the respondent testified that before the girls were taken into foster care, she had cared for them for their entire lives, often on her own. Counsel asked the respondent when she first received guidance about what she needed to do to get her children back. Initially, she stated that she never got any guidance. However, when asked if her caseworker

5

gave her a service plan, she replied, "I don't think I got my first paperwork packet until like 16 months in." She later testified that she did not know what a service plan was. However, she acknowledged that she received a service plan "at some point in time," and she explained that she knew to look "at the back of the paperwork that it says the goals I'm supposed to be trying to meet."

¶ 20     Counsel asked the respondent if she took any steps towards the return of the children during the first 16 months before she received any guidance. She testified that she tried to "clean up" her house, get sober, and set up visits and phone calls with her children. She stated, however, that she was not allowed to have any contact with the children until March 2020 and she had no help arranging visits or phone calls. We note that, although there was very little focus on her contact with the children during the unfitness hearing, the record indicates that both children refused contact with her. By the time the best interest hearing took place in February 2022, the respondent had weekly phone conversations with B.B., but I.B. still refused to speak with her.

¶ 21     The respondent testified that she completed a 60-day drug rehabilitation program at Gateway followed by an outpatient treatment program at Heritage Behavioral Health. She noted that she was required by drug court to do the outpatient program, but she was not required to enter the Gateway program. Asked how these programs helped her, the respondent stated that she learned techniques for coping with stress other than taking drugs.

¶ 22     The respondent further testified about her efforts once she was incarcerated in the DOC. She testified that between February and April of 2020, she was "put on every wait list possible" for programs such as boot camp, parenting classes, and drug rehabilitation. She noted that she had assistance from DCFS liaisons at the prison. She testified, however, that many of the classes were suspended or subject to limited numbers of attendees due to COVID.

¶ 23    On redirect examination, the respondent acknowledged that after being sentenced to drug court in January 2019, the State filed a motion for sanctions against her in March 2019. When asked why, she admitted that it was because she used methamphetamine.

¶ 24    The unfitness hearing continued on February 1, 2021, with the testimony of caseworker Melissa Sanborn. Sanborn's testimony contradicted the respondent's claims concerning the lack of support she received from DCFS.

¶ 25    Sanborn testified at length about her efforts to discuss the respondent's service plans with her. She testified that the respondent failed to show up for two scheduled meetings in May 2018, shortly after Sanborn created the first service plan. However, she was able to meet with the respondent in July 2018. At that time, she explained the goals in the first service plan to the respondent, who signed off on the plan. Sanborn explained that "signing off" on a service plan constitutes an acknowledgement that the plan has been explained to her. The service plan was filed with the court in September 2018.

¶ 26    Sanborn further testified that the respondent canceled a scheduled meeting with her in August 2018. The respondent told Sanborn that there were warrants for her arrest and she was afraid Sanborn would turn her in. Sanborn noted that one of the goals in the respondent's service plans was to meet with the caseworker. She testified that although the respondent did meet with her sporadically, she did not do so regularly. She further testified that the respondent's whereabouts were unknown between August 28 and September 26, 2019.

¶ 27    Sanborn testified that the respondent was in county jails for periods during the pendency of these proceedings. She stated that this interfered with the respondent's ability to complete the goals in her service plans. Sanborn explained that many services were not available in the county jails. She further explained that even when services were available, the short duration of the

7

respondent's incarceration in county jails meant that there would be an interruption in any services she did seek out.

¶ 28    In addition, Sanborn acknowledged that the respondent did not receive her second service plan, which was in effect during the first part of the first nine-month period identified by the State in its motion to terminate. She further acknowledged that, although the fourth service plan was mailed to the respondent in prison, the respondent did not sign off on the plan. Sanborn noted, however, that the goals in each of the service plans were the same.

¶ 29    Sanborn noted that at the time of the February 2019 dispositional hearing, the respondent had not engaged in any of the services required under her service plans. However, in April 2019, the respondent entered an in-patient substance abuse treatment program at Gateway. She completed the program and began outpatient substance abuse treatment. However, the respondent began using methamphetamine again before completing the outpatient treatment.

¶ 30    Sanborn acknowledged that the respondent did not have any positive drug tests pursuant to testing requested by DCFS. She noted, however, that she was aware that the respondent used methamphetamine after completing the in-patient treatment program at Gateway. Sanborn also testified that she made a housing advocacy referral for the respondent while she was staying at a shelter called Grace House.

¶ 31    Finally, Sanborn testified that when the respondent was incarcerated in the DOC, she applied for all appropriate programs and was put on wait lists. However, she testified that prior to that time, the respondent ignored nearly all the recommendations and requirements in her service plans. The lone exception was her effort at substance abuse treatment. Sanborn further testified that in September 2020, the respondent had not completed any of the goals in her plans.

¶ 32    The court announced its findings from the bench at the end of the hearing. The court found that the State had satisfied its burden of proving all four grounds for unfitness by clear and convincing evidence. In addressing the ground of failure to make reasonable efforts to correct the conditions that led to the children's removal, the court expressly found that the respondent's efforts were not reasonable. The court explained that the circumstance that prevented her from completing her service plan goals was her incarceration, which was the result of her own misconduct. In addressing the ground of failure to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children, the court emphasized that the respondent continued to commit felonies despite the impact this would have on her ability to be a parent to her children. The court stated that this demonstrated a lack of concern for their welfare.

¶ 33    The best interest hearing took place on February 7, 2022, after multiple continuances. The court took judicial notice of a letter written by one of the girls and signed by both. In it, they stated that they wanted to be adopted by their foster parents, Betty and Billy, because they felt safe and loved. They also stated that they did not want to move from "house [to] house to house."

¶ 34    The court also took judicial notice of the best interest report filed with the court by DCFS on November 29, 2021. The report noted that the respondent was incarcerated at that time with a projected release date of December 8, 2021. The report further noted that both girls were well-adjusted and "very comfortable" in their foster home and that both wanted to be adopted by their foster parents. The report noted that B.B., who was then 13 years old, refused to have any visits with either of her parents, but was writing letters to her father and speaking with her mother, the respondent, once a week on the telephone. I.B., who was 12 years old, was refusing all contact with both parents. DCFS recommended that the girls be allowed to be adopted because they needed and deserved permanency.

9

¶ 35    The only witness to testify at the best interest hearing was the respondent. She testified that although being in prison had made it difficult for her to do the things DCFS required of her, she managed to get substance abuse treatment and take anger management and domestic violence classes while she was incarcerated. The respondent further testified that she had been released from prison on December 8, 2021, and that she was currently working as an in-home caregiver to a man with ALS. She also lived in his home. She testified that she was applying for other jobs that would allow her to find a home of her own. She was also taking parenting classes.

¶ 36    The respondent acknowledged that the children seemed happy in their foster home. She testified that the foster parents were good people and that she had a positive relationship with them. She further acknowledged that she was aware that the children wanted to be adopted by their foster parents. When asked how she felt about this, she replied, "I mean, I can see where they come from." She acknowledged that she had not "been able to be a part of their" lives for some time, and she noted that the foster parents had a nice home and seemed like "very good people." Referring to her daughters, the respondent testified, "I think that if we could see each other and have a relationship before the court tried to terminate me, they might change their minds."

¶ 37    In explaining his ruling from the bench, the trial judge first stated that the respondent should be commended for the steps she had taken to improve her life. However, he noted that she had not yet had an opportunity to test whether these steps truly gave her the ability to meet her responsibilities as a parent. The judge also noted that the respondent did not have a home where the children could reside with her, that the children did not have a strong bond with her, and that they had expressed a desire to continue living with and be adopted by their foster parents. He also emphasized their need for stability. The court concluded that terminating the respondent's parental rights was in the best interest of the children.

¶ 38    The court entered an order terminating the respondent's parental rights. This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40    On appeal, the respondent challenges both the court's finding of unfitness and its finding that termination of her rights was in the best interest of the children. She argues that these findings were against the manifest weight of the evidence. We disagree.

¶ 41    The Juvenile Court Act of 1987 mandates a two-step process when the State seeks to terminate parental rights. The first step requires the State to prove by clear and convincing evidence that the respondent parent meets the statutory definition of an unfit parent. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If proven by this standard, any one of the statutory grounds for unfitness is adequate for a finding that the respondent is an unfit parent. *In re D.F.*, 201 Ill. 2d 476, 495 (2002). If the court finds the respondent unfit, the process moves to the second step, during which the court considers whether termination of parental rights is in the children's best interest. *Id.* At this stage, the State must prove by a preponderance of the evidence that termination is in the best interest of the children. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 42    Where a respondent challenges the sufficiency of the evidence, we will reverse only if the trial court's findings were against the manifest weight of the evidence. *D.F.*, 201 Ill. 2d at 495. We give great deference to the trial court's findings because the trial judge had the opportunity to observe the witnesses and assess their credibility. Thus, the court's findings are against the manifest weight of the evidence only when "the opposite conclusion is clearly evident from a review of the evidence." *T.A.*, 359 Ill. App. 3d at 960.

¶ 43                                    A. Unfitness

¶ 44    The respondent first challenges the court's finding of unfitness, arguing that there was insufficient evidence to support a finding of unfitness on any of the four grounds alleged. Before considering the evidence concerning each of the four grounds, we note that much of the respondent's argument centers around her assertion that she was hampered by a lack of support from her own caseworker. Although the respondent testified at the unfitness hearing that her caseworker did not provide her with a service plan until 16 months after the children were removed, this testimony was contradicted by the testimony of the caseworker. It was also contradicted by statements the respondent made at some of the permanency hearings, in which she acknowledged that she was aware of the requirements of her service plans. Her testimony was also contradicted by some of her own testimony at the unfitness hearing. At one point, for example, the respondent referred to the goals in her "service plan or *** packet." Other times, she referred to the goals she was supposed to meet that were listed in her "paperwork." Moreover, as we have just explained, we give deference to the trial court's decision because that court was able to observe witnesses and assess their credibility. *T.A.*, 359 Ill. App. 3d at 960. Thus, the court was not required to believe the respondent's assertion that she was hampered by a lack of support from her caseworker.

¶ 45              1. *Failure to Maintain Reasonable Interest, Concern, or Responsibility*

¶ 46    We turn our attention now to the court's specific findings. As stated previously, the State asserted that the respondent was unfit based on four different statutory grounds. The first of these was a failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. See 750 ILCS 50/1(D)(b) (West 2018). In considering this ground for unfitness, courts must consider the parent's efforts to visit and/or maintain contact with the children along

12

with other indicia of concern, such as inquiries about the children's well-being. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35. Courts can also consider the parent's compliance with DCFS service plans. *Id.* The parent's conduct must be evaluated in the context of the circumstances. *Id.*

¶ 47 Here, virtually no evidence was presented during the unfitness hearing concerning the respondent's efforts to visit and communicate with her children or to inquire about their welfare. Instead, both the State and the court relied on evidence that the respondent committed criminal offenses during the pendency of this case and failed to comply with the requirements of her service plans. We need not consider whether this was sufficient to support the court's finding that the respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility for her children's welfare, however. As we mentioned earlier, sufficient proof of any one statutory ground is all that is needed to support a finding of parental unfitness. *D.F.*, 201 Ill. 2d at 495. As we will explain next, we find ample support for the court's finding that she failed to make reasonable progress toward the children's return.

¶ 48                    2. *Failure to Make Reasonable Efforts and Reasonable Progress*

¶ 49 The next two grounds for unfitness asserted by the State were the respondent's failure to make reasonable efforts to correct the conditions that led to the children's removal and her failure to make reasonable progress toward the return of the children. See 750 ILCS 50/1(D)(m)(i), (ii) (West 2018). These are "separate and distinct grounds for finding a parent unfit." *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. Whether a parent has made "reasonable efforts" is evaluated under a subjective standard. *Id.* The question is whether the parent has made "the amount of effort [that is] reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. By contrast, "reasonable progress" is measured by an objective standard. It "requires a measurable or demonstrable movement toward the goal of reunification." *Id.* ¶ 37. A parent has made reasonable

13

progress if the court can find that returning the children to the parent's custody will be possible "in the near future." *Id.* However, if a parent has substantially failed to satisfy the requirements of his or her service plans, the parent has failed to make reasonable progress. *Id.*

¶ 50    Here, the evidence showed that during the first nine-month period identified by the State (January 15, 2019, to October 15, 2019), the respondent's ability to complete recommended services was hampered by the fact that she was in and out of county jails. However, as the trial court found, this was an impediment of her own making. Moreover, although the respondent did receive substance abuse treatment, there was no evidence that she attempted to take any steps toward completing any of the other goals in her service plans during this period.

¶ 51    During the second period identified by the State (October 16, 2019, to April 16, 2020), the respondent signed up for various classes related to the goals in her service plans. She argues that in light of her circumstances, this was all she could do. We need not consider whether these efforts were adequate to be deemed "reasonable" because we find that the evidence was sufficient to support the court's finding that the respondent did not make reasonable progress toward the return of the children during either nine-month period identified by the State.

¶ 52    We reach this conclusion for two reasons. First, it is undisputed that the respondent had not successfully completed any of the goals in her service plans at the time of the unfitness hearings. See *P.S.*, 2021 IL App (5th) 210027, ¶ 37. Second, there was no basis for the court to conclude that returning the children to the respondent's custody would be possible in the near future. See *id.* The respondent was still incarcerated with a projected release date of May 2023, although she testified that she would likely be released earlier due to her participation in programs for which she was eligible for credit against her sentence. (As previously discussed, the respondent was, in fact, released from prison on December 8, 2021.) She had not even begun her domestic violence

14

classes; there was no indication she had appropriate housing secured where she could live with the children when released from prison; and although she had previously undergone substance abuse treatment, she had not undergone any additional treatment after relapsing. This evidence is more than sufficient to support the trial court's finding of unfitness based on a failure to make reasonable progress toward the return of the children during both of the periods identified by the State.

¶ 53                                    3. *Depravity*

¶ 54     The final ground for unfitness asserted by the State was depravity. The pertinent statute provides that there is a rebuttable presumption of depravity if a parent has been convicted of at least three felonies, at least one of which took place within five years before the motion for termination was filed. 750 ILCS 50/1(D)(i) (West 2018). To rebut the presumption, a respondent is only required to present "some contrary evidence," such as evidence of rehabilitation. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 22.

¶ 55     Here, the respondent was convicted of six felonies, all of which occurred within five years of the date on which the State filed a motion to terminate her rights. She argues, however, that this was insufficient to give rise to the presumption of depravity because the State presented no evidence concerning the underlying facts of her convictions. Alternatively, she argues that she rebutted the presumption of depravity. Although we note that the respondent cites no authority to support her contention that evidence of the facts surrounding her convictions is necessary, we need not consider these arguments because we have already concluded that the evidence supported the court's findings of unfitness on other grounds.

¶ 56                                  B. Best Interest of the Children

¶ 57    The respondent next challenges the trial court's finding that termination of her parental rights was in the best interest of the children, arguing that this finding was against the manifest weight of the evidence. We disagree.

¶ 58    The best interest of the children "should not be treated lightly." *In re D.L.*, 326 Ill. App. 3d 262, 271 (2001). The purpose of requiring a separate hearing on this question is to ensure proper focus on the children's best interest, a question that is not a proper consideration unless and until the court finds that the parent is unfit. *Id.* Relevant considerations include the children's bond with foster parents who are willing to adopt them (*J.L.*, 236 Ill. 2d at 344; *P.S.*, 2021 IL App (5th) 210027, ¶ 43; *T.A.*, 359 Ill. App. 3d at 961), the parent's proven unfitness (*D.L.*, 326 Ill. App. 3d at 271), and the parent's realistic ability to properly care for the children and assume parental responsibility any time soon (*J.L.*, 236 Ill. 2d at 344; *P.S.*, 2021 IL App (5th) 210027, ¶ 43; *T.A.*, 359 Ill. App. 3d at 961-62).

¶ 59    The respondent argues that it was not in the children's best interest to have their relationship with their biological mother terminated when she had worked hard to improve her life and her ability to be a responsible parent to them. We recognize, as the trial court did, that the evidence at the best interest hearing showed that in the year between the unfitness hearing and the best interest hearing, the respondent did take steps to improve her life. However, the evidence also showed that she was not yet in a position to resume parental responsibility because she did not have a home where they could live with her and that the children were far more bonded to their foster parents than they were to her. We cannot say that the opposite conclusion is clearly evident. See *T.A.*, 359 Ill. App. 3d at 960. As such, we conclude that the trial court's best interest finding was supported by the evidence.

16

¶ 60                                    III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the order of the trial court terminating the respondent's parental rights.


¶ 62    Affirmed.