2020 IL App (2d) 200425-U
No. 2-20-0425
Order filed December 28, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* C.G., E-J.G., Minors | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | Nos. 17-JA-9 |
| | ) |    17-JA-10 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Anthony G., | ) | Christopher M. Harmon, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court set forth a sufficient factual basis to support its determination that the respondent was an unfit parent; the findings that respondent was unfit and that severing his parental ties was in the minors' best interests were not against the manifest weight of the evidence. Affirmed.

¶ 2   The trial court found respondent, Anthony G., to be an unfit parent and determined that it was in the best interests of his minor children, C.G. and E-J.G., to terminate his parental rights. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On August 31, 2017, pursuant to the State's petitions for wardship, C.G. and E-J.G. (the minors) were adjudicated neglected in that they were in an environment injurious to their welfare and E-J.G. was a newborn exposed to illicit drugs.  In the subsequent dispositional order, both parents were found to be unfit and unable to care for the minors, and a permanency goal of return home in 12 months was set.

¶ 5    Services were ordered for respondent.  They included completing a substance abuse evaluation and treatment recommendations, remain substance free, obtain housing and income suitable for the minors, complete a domestic violence evaluation, and follow treatment recommendations.

¶ 6    On December 14, 2018, following a permanency hearing, the court found that the permanency goal of return home had not been met due to respondent's lack of involvement in services, his having had no contact with the minors since February 2018, his pending DCFS issues with other children, his frequent moving, and the fact that he was currently in jail.  The court changed the permanency goal to substitute care pending termination of parental rights.  Later that day, the minor's mother entered a final and irrevocable consent to adoption.

¶ 7    On April 15, 2019, the State filed a petition for termination of parental rights as to respondent.  The petition alleged that respondent was an unfit person in that he (1) failed to maintain a reasonable degree of interest; (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors from 8/31/17 to 5/31/18 and from 6/1/18 to 3/1/19; and (3) failed to make reasonable progress toward the return of the minors from 8/31/17 to 5/31/18 and from 6/1/18 to 3/1/19.  The petition further alleged that it was in the best interest of the minors that respondent's parental rights be terminated.

¶ 8                                    A. Parental Fitness Hearing

¶ 9     A hearing was held on the parental fitness portion of the petition on September 26 and 27, 2019.  Dana McKenney, the assigned intact caseworker from July 2016 through the August 31, 2017, adjudication, testified first for the State.  She explained that "intact caseworkers" are contracted through DCFS to provide services to the families of children residing at home with their parents, in efforts to strengthen the family and keep them together.  During the entire time she was the caseworker, however, the minors lived with their maternal grandmother; respondent and the minors' mother were only allowed supervised visitation with the minors.  E-J.G., who was born in July 2016, has never been in the exclusive care of her parents.  In January of 2017, McKenney made the referral to file the original Petitions for Adjudication of Wardship, which were filed February 27, 2017.

¶ 10    The case remained assigned to her through the adjudication, and she prepared the integrated assessment and service plan for the dispositional hearing on October 5, 2017.  Pursuant to her integrated assessment, Anthony needed to cooperate with the agency and participate in services to address his substance misuse, domestic violence issues, employment, and housing.  The services were formally set forth in the service plan.  McKenney testified that many of the services recommended had been offered to respondent prior to the dispositional hearing on October 5, 2017, and he had engaged in some of the services, but housing, substance abuse, and domestic violence services remained incomplete.

¶ 11    During the duration of McKenney's case management, respondent was entitled to supervised, parent-child visitation.  Between October 2016 and April 2017, however, respondent was incarcerated in the Winnebago County Correctional Facility for a sentence related to a conviction for domestic battery, after which he resided in New Milford, Illinois, in housing the agency helped him obtain.  She testified that while she was the assigned caseworker she never

recommended that respondent have unsupervised, parent-child visitation with his children because there were outstanding services for substance abuse and domestic violence treatment.

¶ 12    The goal of "remain intact" was rejected by the court, as in fact, the family was not intact. After the court set the permanency goal of return home in twelve months, the case was transferred to Jamie Mowers, one of the "placement" caseworkers with Youth Service Bureau.

¶ 13    Mowers testified that although the permanency goal had changed, the services remained essentially the same.  Respondent was to complete substance abuse and domestic violence treatment, to obtain housing and income, and to demonstrate he was drug free.  With respect to the revised case plan of October 30, 2017, Mowers testified that respondent was working full time, had housing, and was cooperating with the agency; however, he was rated unsatisfactory in the areas of substance abuse and domestic violence.

¶ 14    Mowers prepared another case plan, dated April 12, 2018.  In that case plan, the goal of return home was rated as unsatisfactory.  Respondent had "very limited contact with the agency as of February" and none between February and April 2018.  A diligent search completed on April 18, 2018, was unproductive.  Mowers also had contact with respondent's caseworker for his Lincoln County case.  Respondent was rated unsatisfactory in all of his services.

¶ 15    Mowers had no contact with respondent between February and September 2018, and he had not contacted the minors.  In the service plan dated September 20, 2018, she continued to rate him as unsatisfactory in all areas.  In September, Mowers located respondent in the Winnebago County jail and visited him there.  He stated that he had entered, or would be entering a drug treatment program, and Mowers discussed with him the need to provide the agency with documentation.  She told him to contact her once he was released so that they could meet and go over his services.

¶ 16    Respondent did not contact Mowers when he left the Winnebago County jail, necessitating another diligent search on December 19, 2018.  The search was not successful.  The case had been taken to legal screening in April 2018.  In the January 9, 2019, service plan, the permanency goal was changed to substitute care pending court determination on termination of parental rights.  As of March 1, 2019, all of respondent's services listed in the dispositional order of October 5, 2017, remained outstanding.  Mowers stated that she was unaware of any impediment which would have prevented respondent's engagement in services or prevent him from contacting the minors.

¶ 17    Mowers testified that she was made aware, by the foster mother, that respondent had "FaceTimed" with the minors in May 2019.  The contact was not approved by the agency.  On cross examination, she stated that in January 2018 respondent was complying with random urine drops and waiting for a referral for substance misuse treatment.  She was aware that between October 2017 and February 2018 respondent was attempting to enter a substance abuse program that was more amenable to his work schedule.  Mowers confirmed that between February 2018 and September 2018, she had no contact with respondent, and that she had contact with respondent while in jail but upon his release had no further contact with him until the change in permanency goal.  During all times relevant, respondent had her contact information, which at no time changed.

¶ 18    The State's final witness was respondent, who stated that a case plan was first put into place shortly after the birth of E-J.G..  At the time, he, the minors' mother, and the minors were living with the maternal grandmother.  After going to jail in October 2016, he was kicked out of the house.

¶ 19    Respondent stated that he was served with papers for this case while in the Winnebago County jail and was present in court for the October 5, 2017, disposition hearing.  He was aware of the services ordered on that date and the need to show proof that those services were completed.

He stated that he did detox at Rosecrance and was engaged in intensive outpatient classes before being arrested for Driving on a Revoked license and spending 45 days in jail. Respondent testified that he signed releases for Rosecrance so that his caseworker could know what he was doing. With regard to domestic violence treatment, respondent stated that he did a few classes while he was in jail but was unable to get documentation. He completed 105 hours of treatment for domestic violence before the minors were born and denied that there were domestic violence issues after he completed that treatment.

¶ 20    After being released from jail in September or October of 2018, he lived in a homeless shelter in Rockford. He was unemployed and had no phone. He had no physical visits with the minors between February and October of 2018, although he video chatted with them. Respondent testified that he would text Mowers, but she would not text him back.

¶ 21    Respondent stated that in March 2019 he was homeless again and staying in an abandoned house in the Rockford area. He had no employment and was struggling with his addiction problems, which included alcohol and heroin abuse. He was in inpatient rehab at Rosecrance in March, got out, but relapsed after learning his mother had cancer. She died in April, and he went back to Rosecrance in May 2019.

¶ 22    Respondent testified that from 2018 to 2019 he had three rounds of inpatient treatment at Rosecrance. He also testified that his longest period of employment was for two months. At the time of the hearing, he resided with his wife and two step-children in Belvidere and was working 50 hours a week.

¶ 23    The State rested and respondent made a motion for directed finding, which, after argument, was denied. Respondent rested, the parties proceeded to arguments, and the case was continued for decision.

¶ 24　On December 5, 2019, the court announced its decision on the unfitness portion of the proceedings. The court found that respondent "did make reasonable efforts" to maintain a "reasonable degree of interest, concern, or responsibility" for the minors; respondent did not, however, make reasonable progress toward the return of the minors. Accordingly, the court determined that the State had proven by clear and convincing evidence respondent's unfitness to be the minors' parent.

¶ 25　　　　　　　　　　　　　B. Best Interests Hearing

¶ 26　On January 10, 2020, the case reconvened for a hearing as to best interests. Caseworker Mowers testified that the minors have been placed with their maternal grandparents and half-brother since prior to her involvement in the case in October 2017. C.G., four years old at the time of the hearing, has resided there most of his life, and E-J.G., three years old, has lived there her entire life. The minors have not seen respondent since February 2018.

¶ 27　Mowers has had multiple opportunities to observe the minors in the foster home, including monthly monitoring. She testified that the minors have bonded with their grandparents, whose single-family home is close to community services. There is a play-set in the backyard and, in summer months, a little pool to play in. While the children have resided with the foster-grandparents, they have thrived and their individual and collective needs have been met. Mowers believes that the placement is safe and appropriate and that it is in both minors' best interest to remain there. She also believes that it is in both minors' best interest that respondent's parental rights be terminated to allow the minors to achieve permanency through adoption.

¶ 28　On cross examination, Mowers testified that the minors' mother and her own mother, the foster grandparent, maintain an ongoing relationship. The minors' mother exercises weekly

parent-child visitation with the minors, supervised by the foster grandparent, who closely monitors the minors' mother's mental health and sobriety to determine whether visitations take place."

¶ 29    Beverly Stewart, a CASA volunteer assigned to the case in September 2017, testified that she visits the minors once or twice a month. She has observed the minors interacting with their grandparents and described a very close, comfortable relationship. The minors are "absolutely" bonded with their grandparents. Their relationship with their half-brother is a "typical" sibling relationship, and the minors look up to him. She observed respondent once with the minors and her recollection is that he interacted with them appropriately. The home is lived-in but organized and neat and clean. The foster parents provide for the minors emotional and physical needs. She stated that the minors are where they should be, in a loving home with loving grandparents.

¶ 30    The State's final witness was Debbie Hookstadt, the maternal grandmother of the minors. She picked E-J.G. up from the hospital when she was born, and E-J.G. has not left her care. She described her relationship with both minors as very close. She and her husband are "absolutely" willing and able to take care of the minors and committed to adopting them.

¶ 31    The State rested and respondent was called. He testified that he resides in Belvidere, Illinois, in a three-bedroom house with his wife and two step-children. He has been working fulltime, at least 50 hours per week, for about six months. The last time he physically saw the minors was in 2018.

¶ 32    Respondent stated that he has been clean since May 22, 2019, and his wife, who is in intensive outpatient treatment, has been clean "for a long time." He tries to attend AA or NA meetings at least twice a week while juggling family responsibilities. He has a sponsor.

¶ 33    On cross-examination, respondent stated that he has three biological children, including another son whose life he is not involved in. He believes the minors are attached to him and that

E-J.G. would be able to point him out. He has been in treatment before and has relapsed before. He agrees that the maternal grandparents provide a stable, loving home for the minors.

¶ 34 The case was continued for decision. On June 29, 2020, in a written memorandum and decision, the court detailed the evidence establishing respondent's unfitness. The court also detailed the evidence related to the minors' best interests and announced that the State had proven by a preponderance of the evidence that it was in the minors' best interests to terminate respondent's parental rights and to make them available for adoption by their maternal grandparents.

¶ 35 Respondent filed his notice of appeal on July 29, 2020.

¶ 36                                II. ANALYSIS

¶ 37 To support a judgment of termination of a mother's or father's parental rights, there must first be a showing of parental unfitness based upon clear and convincing evidence, and a subsequent showing that the best interests of the child are served by severing parental rights based upon a preponderance of the evidence. *In re C. W.*, 199 Ill. 2d 198, 210 (2002); *In re A.F.*, 2012 IL App (2d) 111079, ¶¶ 40, 45.

¶ 38                                A. Unfitness

¶ 39 Although section 1(D) of the Adoption Act sets forth numerous, discrete grounds under which a parent may be deemed "unfit," "any one ground, properly proven, is sufficient to enter a finding of unfitness and support a subsequent termination of parental rights." (Internal quotation marks omitted.) *In re C.W.*, 199 Ill. 2d 198, 210, 217 (2002); see 750 ILCS 50/1(D) (West 2019) (providing that the "grounds of unfitness are *any one or more* of the following" enumerated grounds (emphasis added)). "We defer to the trial court for factual findings and credibility assessments because it is in the best position to make such findings and we will not reweigh

evidence or reassess witness credibility on appeal." (Internal quotation marks omitted.) *In re A.F.*, 2012 IL App (2d) 111079, ¶ 40. For this reason, the trial court's finding of unfitness is entitled to great deference, and we will not disturb its finding unless it is against the manifest weight of the evidence. *In re D.F.*, 332 Ill. App. 3d 112, 124 (2002). The trial court's finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *In re D.L.*, 326 Ill. App. 3d 262, 270 (2001).

¶ 40 Here, the trial court found that respondent failed to make reasonable progress toward the return of the minors See 750 ILCS 50/l(D)(m)(ii) (West 2016) (providing that a finding of unfitness may rest on the failure by a parent "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected *** minor"). Respondent contends that the trial court erred in finding him unfit because it did not specify in which of the two alleged nine-month periods respondent failed to make reasonable progress.

¶ 41 Respondent cites *In re Madison H.*, 215 Ill. 2d 363 (2005), in which the supreme court interpreted section 2–27(1) of the Juvenile Court Act (705 ILCS 405/2–27(1) (West 2002)), a provision that relates to the placement of a minor following a dispositional hearing and "expressly requires the trial court to put 'in writing' the factual basis for its determination." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶31 (citing *In re Madison H.*, 215 Ill.2d at 374). Respondent "does not direct us to any provision requiring the trial court to put 'in writing' the factual basis for its parental unfitness determination at a termination proceeding." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 32. Nor does respondent cite authority for his statement that "[t]he trial court should make explicit the beginning and end dates it considered under" section l(D)(m)(ii) of the Adoption Act.

¶ 42 In *B'Yata I.*, this court remanded a termination case where the trial court did not set forth a factual basis to support its determination that the respondent was an unfit parent. 2013 IL App

(2d) 130558, ¶ 34. In that case, we concluded that the failure to set forth a factual basis prevented us from conducting a meaningful review of the unfitness finding. *Id*. This case is different.

¶ 43    Here, in its written Memorandum and Decision, the court recounted the two alleged nine-month periods in which respondent failed to make reasonable progress toward the goal of returning the minors. Under the section of its decision titled "Summary of Evidence (Parental Fitness)," the court selectively detailed, with appropriate dates, the evidentiary basis for its unfitness determination. In the section titled Analysis (Parental Unfitness), the court found:

> The evidence presented throughout the hearing on parental fitness established that the primary and systemic impediment preventing [respondent] from correcting the conditions resulting in the removal of his children from his care, was his pervasive and ongoing substance misuse. This situation resulted in numerous periods of inpatient treatment, frequent and lengthy periods of incarceration, followed by relapse Reasonable efforts of a parent are subjective in nature. It is clear from the evidence, [respondent] tried to complete the service plan by addressing his substance misuse, domestic violence issues, and issues of housing and employment."

¶ 44    Noting that E-J.G. "has never been in his care" and C.G. "only for a short percentage of his life, the court found that, despite respondent's efforts, the "credible evidence presented established that Anthony failed to make timely, reasonable progress toward correcting the conditions which resulted in the children being removed from his care."

¶ 45    We are not deprived of meaningful review.

¶ 46    Respondent additionally contends that the evidence was insufficient to show that he was an unfit parent. We disagree. Where a service plan has been established, "'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to

substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication" of neglected minor. 750 ILCS 50/l(D)(m)(ii) (West 2016); see *C.W.*, 199 Ill. 2d at 213-14 (2002) ("reasonable progress" includes a parent's compliance with court directives).

¶ 47 Caseworker McKenney testified that at the time of the dispositional hearing on October 5, 2017, respondent had engaged in some services, but housing, substance abuse, and domestic violence services remained incomplete. Caseworker Mowers corroborated McKenney's testimony, stating that as of October 30, 2017, respondent was working full time, had housing, and was cooperating with the agency; he was, however, rated unsatisfactory in the areas of substance abuse and domestic violence.

¶ 48 Respondent had limited contact with the agency as of February and none between February and April 2018. In the case plan dated April 12, 2018, the goal of return home was rated as unsatisfactory, and respondent was rated unsatisfactory in all of his services. Mowers testified that she continued to have no contact with respondent until September 2018, when she found him in jail. In the service plan dated September 20, 2018, she continued to rate him as unsatisfactory in all areas.

¶ 49 Although Mowers told respondent to contact her when he got out of jail, he did not. As of March 1, 2019, all of respondent's services listed in the dispositional order of October 5, 2017, remained outstanding.

¶ 50 Given the manifest weight of the evidence, we conclude that the trial court did not err in determining that respondent was unfit under section 1(D)(m)(ii).

¶ 51                                    B. Best Interests

¶ 52　　The focus shifts to the child after a finding of parental unfitness. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The issue is no longer whether parental rights can be terminated; the issue is whether, in light of the child's needs, parental rights should be terminated. *Id.* At the best interests hearing, the trial court considers:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments *** (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2016).

We will not overturn the trial court's finding that termination of parental rights is in the child's best interests unless it is against the manifest weight of the evidence. *In re Shru. R.,* 2014 IL App (4th) 140275, ¶ 24.

¶ 53　　At the best interest hearing, the testimony established that C.G. has lived with his maternal grandparents most of his life, and E-J.G. has lived with them all of her life. They have not seen respondent since February 2018. The minors have bonded with their grandparents. They are thriving and their individual and collective needs are being met. All of the witnesses, including respondent, agreed that the minors' placement with the grandparents is safe, appropriate, and loving. As for the grandparents, they are willing and able to take care of the minors and are committed to adopting them.

¶ 54 Respondent demonstrated his interest in maintaining a parent-child relationship by being present, and testifying, at the fitness and best interest hearings. However, his interest "must yield to [the minors'] interest in a stable, loving home life." *In re D.*, 212 Ill. 2d 347, 364 (2004).

¶ 55 The court's determination that it was in the minors' best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 56                                     III. CONCLUSION

¶ 57 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 58 Affirmed.