NOTICE
Decision filed 08/19/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210096-U

NOS. 5-21-0096, 5-21-0097 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* R.T., J.S., and S.S., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Randolph County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 17-JA-19, 17-JA-20 |
| | ) | |
| Jodie T., | ) | Honorable |
| | ) | Richard A. Brown, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's finding that respondent was an unfit person based upon its determination that respondent failed to make reasonable progress for the return of the minor children during any nine-month period following the adjudication of neglect was not contrary to the manifest weight of the evidence.

¶ 2    Respondent, Jodie T., is the natural mother of R.T.,[1] J.S.,[2] and S.S.[3] (minor children). On February 25, 2021, the circuit court found respondent to be an unfit person

_____

[1]Born on June 28, 2007.

[2]Born on September 16, 2010.

1

and terminated her parental rights based upon its finding that the termination of her parental rights was in the best interests of the minor children. Respondent appeals the circuit court's judgment arguing that the State failed to prove that respondent had not made reasonable effort towards the return of the minor children during any nine-month period following the adjudication of abuse or neglect. Respondent also argues that the circuit court erred in finding that respondent had not made a reasonable effort to correct the conditions that were the basis for the removal of the minor children and erred in finding that respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                          I. BACKGROUND

¶ 4    On May 16, 2017, the State filed a juvenile petition[4] pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2016)). The juvenile petition alleged that the minor children were neglected as defined in section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)) because respondent was incarcerated in St. Clair County, Illinois, and had left the minor children with an individual that respondent was aware used

---

[3]Born on October 20, 2011.

[4]A juvenile petition was filed on behalf of R.T. in matter 17-JA-19 and on behalf of J.S. and S.S. in matter 17-JA-20. The juvenile petition filed on behalf of R.T. was also filed against R.T.'s natural father, but the termination of R.T.'s natural father's parental rights are not at issue in this appeal. The juvenile petition filed on behalf of J.S. and S.S. indicated that their natural father was deceased. The common law records do not contain a circuit court order consolidating the cases; however, the records indicate that the circuit court proceeded with the two separate cases as a single matter. As such, we will refer to the filings on behalf of the minor children collectively without separately indicating to which minor child the filing applied unless the filings differ, or such clarification is needed for our analysis.

methamphetamine and that individual had left the minor children home alone for hours at a time. As such, the juvenile petition alleged that the minor children were neglected due to being in an injurious environment pursuant to section 2-3(1)(b) of the Act (*id.*). The same day, the circuit court entered a temporary custody order granting temporary custody of the minor children to the Guardianship Administrator of the Department of Children and Family Services (DCFS).

¶ 5    On August 31, 2017, respondent appeared before the circuit court with counsel and admitted to the allegations contained in the juvenile petition. Based on respondent's admissions, the circuit court adjudicated the minor children as neglected as defined in section 2-3(1)(b) of the Act, in that respondent's conduct had placed the minor children in an injurious environment. *Id*. The same day, Caritas Family Solutions (Caritas), on behalf of DCFS, filed its integrated assessment, respondent's recent service plan, and a visitation plan with the circuit court.

¶ 6    According to Caritas's integrated assessment, respondent was incarcerated due to a possession of methamphetamines charge and had left the minor children with Mark F., her paramour. Mark F. was supposed to be caring for the minor children but left them home alone after he believed law enforcement and/or DCFS was attempting to contact him. A concerned citizen called law enforcement, and the minor children were taken into protective custody on May 12, 2017. Shortly after being placed in a foster home, S.S.'s foster parents reported that S.S. was making inappropriate sexual statements such as "eat my pussy" while playing with her toy horse figurine and was verbalizing and reenacting other sexual conduct when playing with dolls. The integrated assessment further stated

3

that it was reported that S.S. disclosed that "Richard touched me. Richard hurt me" and that Richard was the name given to Mark F.'s penis. Another source disclosed that Mark F. had taken S.S. into the bathroom and S.S. was heard screaming for help.

¶ 7 The integrated assessment also stated that respondent appeared to be well versed on how the "system" worked and the structure of the interview due to the minor children's previous placements in foster care. In 2008, respondent had left R.T. in the care of her parents who she knew were registered sex offenders, and R.T. was taken into protective custody. R.T. was returned to respondent under the condition that respondent was not to allow her parents unsupervised contact with R.T. Respondent then left all three minor children in her parents' care when she was incarcerated in July 2014, and the children were placed in protective custody and later returned to respondent's care.

¶ 8 At the time of Caritas's integrated assessment, respondent was separated from Mark F. and there was an ongoing investigation into the sexual misconduct allegations involving S.S. Respondent stated during her interview with Caritas that she had been incarcerated and was not aware of Mark F.'s conduct with S.S. or that the home was in serious disarray with no food that the children knew how to prepare or clean clothes. After her release from 3½ weeks of incarceration, respondent was living in an apartment, was eight months behind on the rent, and was unemployed.

¶ 9 Respondent's service plan filed on August 31, 2017, was dated June 16, 2017, and the plan tasked respondent with the following: (1) to fully cooperate with Caritas, (2) to undergo a mental health assessment and cooperate with any recommendations resulting from the assessment, (3) attend parenting education, (4) obtain a substance abuse

4

assessment and cooperate with any recommendations resulting from the assessment, (5) secure and maintain legal employment, (6) provide suitable housing for the family and stabilize there for at least six months, and (7) refrain from criminal activity and comply with the terms of her probation. Each of these tasks included an agreement to execute all consents for release of information and to not discontinue any service without Caritas's approval.

¶ 10    Respondent's service plan of June 16, 2017, recommended a permanency goal of return home within 12 months to give respondent time to correct the conditions that led to the minor children being taken into protective custody. Respondent acknowledged that she received the service plan and that the service plan was explained to her on August 31, 2017. The visitation plan stated that respondent would be allowed one hour per week of supervised visitation with the minor children at the DCFS office in Sparta, Illinois.

¶ 11    On September 29, 2017, Caritas filed a dispositional report with the circuit court. The dispositional report indicated that respondent had engaged in services during the prior two months seeking inpatient rehabilitation on her own and attending both mental health and substance abuse counseling. Respondent had not, however, gained employment, found suitable and stable housing, or sought parenting education, although the dispositional report indicated that respondent was actively seeking housing and employment. The dispositional report also indicated that respondent's visitation had not been increased because "[u]pon returning from visits, the children almost always have nightmares, bedwetting, and waking up screaming in fear." Finally, Caritas's dispositional report recommended to the circuit court that it grant DCFS custody and

5

guardianship of the minor children, and that respondent be ordered to cooperate with Caritas and the services outlined in the service plan.

¶ 12 The circuit court entered an order of disposition on October 5, 2017. The disposition order indicated that the circuit court found respondent unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor children. The circuit court further found that reasonable efforts had been made to prevent the need for the removal of the minor children from the home, but that those efforts had been unsuccessful. Based upon those findings, the circuit court found it to be in the best interests of the minor children to remove them from the custody of respondent and grant custody and guardianship to DCFS. The circuit court's dispositional order also directed that respondent would have no less than two hours per week of visitation and ordered respondent to cooperate with the following: (1) obtain a psychological evaluation and cooperate with the treatment recommendations; (2) obtain a drug/alcohol assessment and cooperate with the treatment recommendations; (3) refrain from the use of all mood or mind-altering substances, including alcohol, cannabis, and controlled substances except those prescribed by a licensed physician; (4) establish and maintain an appropriate, clean, healthy, and stable residence; (5) immediately inform her caseworker of any change in the number or identity of persons residing or staying at the residence; and (6) cooperate fully and completely with DCFS, or private agency assigned to the case, the service plan, and services offered to the family. Finally, the circuit court's dispositional order advised respondent that failure to complete the service plan, cooperate with any after-care plan, or comply with the terms of the dispositional order may cause

6

respondent to risk the loss of custody and/or terminations of her parental rights regarding the minor children.

¶ 13    Caritas filed a status report with the circuit court on January 3, 2018. The status report indicated that respondent had kept in contact with the agency thus far and had attended visitations, court appearances, and meetings. The status report further indicated that respondent had engaged in most of her services and was working towards the other services. Respondent was rated satisfactory for substance abuse since she had completed a substance abuse assessment but rated unsatisfactory for mental health because respondent's self-reported counseling over the previous three months had not been verified. The status report of January 3, 2018, further indicated that respondent had not gained employment, had not participated in parenting education, and had not obtained stable housing since respondent had lived in a minimum of two homes, jail, a rehabilitation facility, and a shelter in the previous six months. As such, respondent was rated unsatisfactory for these tasks.

¶ 14    On February 23, 2018, Caritas filed a permanency hearing report with the circuit court. The permanency hearing report indicated that respondent had self-reported receiving mental health counseling, but that the facility at which respondent stated she was receiving the counseling verified that respondent had only been seen three times, the last time being June 21, 2017. The permanency hearing report also indicated that respondent had completed a 30-day inpatient substance abuse treatment, but was then unsuccessfully discharged on November 27, 2017, for failing to continue in outpatient services. The permanency hearing report further indicated that respondent's probation

officer had reported that respondent was last seen for drug testing in December 2017, when she refused the drug test stating that she would test positive for cannabis. The permanency hearing report went on to indicate that respondent had not engaged in parenting education, was living with a paramour and his parents, and became employed on January 2, 2018, but had stopped working in February 2018.

¶ 15   Caritas's February 23, 2018, permanency hearing report went on to indicate that respondent had missed minimal visits with the minor children and that she always provided a meal and occasionally brought the minor children gifts. The permanency hearing report stated that respondent was very engaged with the minor children on some visits, but then at others, her interactions were limited. The permanency hearing report noted that respondent's tone and manner with the minor children was often harsh. Finally, the permanency hearing report recommended to the circuit court a permanency goal of return home within 12 months and a recommended date for the achievement of the permanency goal of September 31, 2018.

¶ 16   The circuit court entered an initial permanency order pursuant to section 2-28(2) of the Act on March 5, 2018. 705 ILCS 405/2-28(2) (West 2018). The initial permanency order indicated that respondent had not made substantial progress towards the return home of the minor children and directed that the minor children remain in the custody of DCFS with a permanency goal of returning home within 12 months.

¶ 17   On May 22, 2018, Caritas filed respondent's service plan dated April 18, 2018. Under the summarization of the family's progress since the last review, Caritas noted that there was a pending investigation involving respondent and the minor children due to

8

"the added allegation of Human Trafficking that was added in March thru a Related Information Report" and allegations that there had been sexual abuse concerning the minor children while they lived with respondent in her mother's home. As such, the trauma-informed therapist had requested that respondent's visitation with the minor children be discontinued for 60 days due to the additional disclosures. The respondent's service plan also indicated that respondent was residing with a paramour and his parents, was unemployed, and had not completed her recommended services. All tasks within respondent's April 18, 2018, service plan remained the same as respondent's previous service plan.

¶ 18   On June 26, 2018, Caritas filed a status report with the circuit court. The status report indicated that respondent had not completed her recommended services since the last court hearing on March 5, 2018, and that respondent had failed to appear for her random drug test on April 26, 2018. According to the status report, respondent informed Caritas on June 7, 2018, that her attorney had advised her not to have any further contact with Caritas. The status report also indicated that respondent's visitations with the minor children had been suspended as of March 16, 2018, due to a critical decision made by the trauma-informed clinician.

¶ 19   On August 17, 2018, Caritas filed another permanency hearing report (second report) to the circuit court. The second report indicated that respondent had failed to complete substance abuse counseling, parenting education, and maintain stable housing. The second report also indicated that respondent no longer resided with her paramour and his parents because he had "punched her in the mouth and was arrested." The second

report stated that respondent had been employed since June 2018 and that respondent's visitations with R.T. and J.S. had resumed on June 27, 2018; however, respondent was often harsh and "picks at the children during the visit." The second report recommended to the circuit court that the permanency goal be changed to substitute care pending court determination on termination of parental rights because the permanency goal of return home was no longer in the best interests of the children. Caritas based this recommendation on respondent's failure to correct the conditions that brought the minor children into DCFS's custody and her failure to complete her services. On November 8, 2018, the circuit court entered its second permanency order. The second permanency order entered by the circuit court indicated that respondent had not made substantial progress towards the return home of the minor children but retained the permanency goal of return home within 12 months.

¶ 20    On January 3, 2019, Caritas filed respondent's service plan dated November 15, 2018, with the circuit court. Respondent's service plan indicated that respondent was unemployed and was living with a friend. The service plan also indicated that respondent's progress was unsatisfactory concerning substance abuse since respondent had not completed any requested drug tests, had been unsuccessfully discharged from substance abuse treatment in November 2017, and had not reengaged in substance abuse counseling. Respondent was also rated unsatisfactory in the service plan regarding mental health services since respondent had not attended mental health counseling since October 11, 2017, and had not attempted to reengage. The service report further indicated that respondent had attended four parenting education sessions in 2017, but did not complete

the program and was rated unsatisfactory in parenting education. All tasks within respondent's November 15, 2018, service plan remained the same as respondent's previous service plans.

¶ 21    Caritas next filed a permanency hearing report (third report) with the circuit court on April 26, 2019. The third report indicated that Caritas could not confirm whether respondent had completed any tasks concerning substance abuse or mental health services since respondent had not signed a release for the information despite three requests for her to do so. The report also noted that respondent was staying between three different homes. Concerning visitation, the third report stated that during the April 17, 2019, visit, respondent "was yelling at the children about how disrespectful they are to her and they do not appreciate anything she does for them." Finally, the report recommended to the circuit court that it was in the best interest of the minor children to have a goal of substitute care pending court determination on termination of parental rights because the case had been open for two years and respondent had not been consistent in housing or services. On May 30, 2019, the circuit court entered its next permanency order retaining a permanency goal of return home within 12 months.

¶ 22    Caritas filed its fourth permanency hearing report (fourth report) with the circuit court on November 7, 2019. The fourth report indicated that Caritas had contacted the facility at which respondent had self-reported receiving substance abuse and mental health services. The facility informed Caritas that every individual must execute releases upon entering any program at the facility and there were no releases on file for respondent. The fourth report also indicated that respondent had not begun parenting

11

education, but had, since the death of her mother in February 2019, been residing in her mother's home with her brother. The fourth report further stated that respondent had been employed since October 2018, had completed the conditions of her probation, and was released from probation as of July 17, 2019. Finally, the report indicated that respondent had missed visitation due to being late or having a last-minute excuse. The fourth report again recommended to the circuit court a permanency goad of substitute care pending court determination on termination of parental rights.

¶ 23    On January 23, 2020, Caritas filed its fifth permanency hearing report (fifth report) with the circuit court. Again, Caritas could not confirm respondent's self-reporting concerning her substance abuse or mental health services since the facility indicated that they do not have any releases for respondent and, as such, that would indicate that respondent had not engaged in services at that facility. The fifth report stated that respondent had begun, but not completed, her parenting education and that respondent remained employed. The fifth report further stated that respondent remained in her mother's home, but that Caritas had not been able to inspect the safety of the home since respondent had not returned messages Caritas had left since December 28, 2019. Regarding visitation, the fifth report indicated that respondent was attending visitations regularly, but had missed visitation on December 7, 2019, January 4, 2020, and January 11, 2020, without prior notification. The fifth report's recommended permanency goal to the circuit court was again substitute care pending court determination on termination of parental rights.

12

¶ 24    Also on January 23, 2020, Caritas filed respondent's updated service plan dated November 15, 2019. Again, respondent was rated unsatisfactory in substance abuse services, mental health services, and parenting education on the same basis indicated in respondent's previous service plans. The updated service plan indicated that respondent still resided in her mother's house, but that a previous caseworker visited the home and found that the home was not safe for the minor children because there were rooms with padlocks that respondent refused to allow the caseworker to view or inspect. All tasks within respondent's November 15, 2019, service plan remained the same as respondent's previous service plans. On March 2, 2020, the circuit court entered a permanency order changing the permanency goal from return home within 12 months to substitute care pending court determination on termination of parental rights.

¶ 25    On June 24, 2020, Caritas filed respondent's updated service plan dated April 15, 2020, with the circuit court. All tasks within respondent's April 15, 2020, service plan remained the same as respondent's previous service plans since the updated service plan indicated that respondent had not completed any of her services including substance abuse services, mental health services, and parenting education. The updated service plan further noted that respondent had failed to notify Caritas of a pending legal matter in Randolph County, Illinois, for bad checks and driving on a suspended license which occurred in January and February 2020. The recommended permanency goal stated in the updated service plan was substitute care pending court determination on termination of parental rights based on respondent failing to make progress on her services despite having three years to complete the services.

¶ 26 Caritas filed its last permanency hearing report (last report) with the circuit court on August 24, 2020. The last report indicated that respondent did a mental health assessment on May 6, 2020, and was referred to a psychiatrist, but it does not indicate whether respondent followed through on the referral. The last report also stated that respondent self-reported that she had engaged in substance abuse services at the same facility, but the facility confirmed that respondent had only engaged in mental health services. Further, the last report indicated that respondent was scheduled for drug testing on June 24, 2020, July 23, 2020, and August 21, 2020, but only appeared on June 24, 2020. The June 24, 2020, drug test was negative.

¶ 27 The last report of August 24, 2020, also indicated that it was unknown whether respondent completed her parenting education class, and it was also unknown whether respondent was still employed since respondent had not provided the proper documentation for proof of employment. The last report indicated that respondent still resided in her mother's home with her brother and continued to attend all court hearings and most of the visitations. The last report recommended to the circuit court that the permanency goal remain substitute care pending court determination on termination of parental rights since respondent had not shown the ability to care for the children safely and appropriately, and that the minor children had developed a strong bond with their foster parents. The last report also noted that respondent had been given ample time to attend and complete services and had failed to do so.

¶ 28 On September 14, 2020, the circuit court entered a permanency order with a permanency goal of substitute care pending court determination on termination of

14

parental rights and set the matter for a termination of parental rights/fitness hearing. The same day, the State filed a motion for appointment of guardian with power to consent to adoption. The State's motion indicated that the minor children had been found to be neglected and were adjudicated wards of the court on August 31, 2017, and that a disposition order was entered on October 5, 2017. The State's motion further stated that respondent was an unfit person as described within section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) and section 2-29 of the Act (705 ILCS 405/2-29 (West 2020)), as follows:

> "a. [Respondent] failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors. [750 ILCS 50/1.D(b).]
>
> b. [Respondent] failed to make reasonable efforts to correct the conditions that were the basis for removal of the minors. [750 ILCS 50/1.D(m)(i).]
>
> c. [Respondent] failed to make reasonable progress toward the return of the minors within nine months after an adjudication of abuse, neglect, or dependency. [750 ILCS 50/1.D(m)(ii).]"

As such, the State requested that respondent's parental and residual parental rights to the minor children be forever and permanently terminated and that DCFS be appointed guardian with power to consent to the adoption of the minor children.

¶ 29 On October 20, 2020, Caritas filed a termination report with the circuit court. The termination report indicated that within the past nine months from respondent's service

15

plan dated April 15, 2020, respondent remained unsatisfactory in substance abuse services, parenting education, and mental health services. The termination report indicated that respondent was unsuccessfully discharged from substance abuse services in November 2017 for failing to engage in any outpatient services and that respondent had made no attempt to reengage in substance abuse services. The termination report also indicated that respondent had tested positive for THC on August 21, 2020, September 24, 2020, and October 16, 2020.

¶ 30    Concerning mental health, the termination report indicated that respondent was participating in mental health services until February 2019, but was discharged from mental health services unsuccessfully on May 30, 2019. The termination report stated that on October 7, 2020, Caritas received records indicating that respondent had reengaged in mental health services and did telehealth on September 1, 2020, September 15, 2020, September 23, 2020, and October 7, 2020, but noted that respondent was still rated as unsatisfactory since the services were not completed. Regarding respondent's parenting education task, the termination report indicated that respondent did not complete her parenting class in 2017, but had started a class on September 21, 2020, and completed the class on October 14, 2020.

¶ 31    Caritas's termination report further noted that respondent had not participated in her services to a satisfactory level although she was given three years and five months to complete her services. The termination report stated that respondent had not shown that she had accepted any responsibility for what brought the minor children into DCFS's care, and that respondent was still currently prohibited from visiting S.S. due to a court

16

order. The report indicated that the minor children were very well adjusted and appeared to love their foster parents "very dearly." The termination report further indicated that the minor children's foster parents were very good at taking care of the minor children, were committed to permanency, and wished to adopt the minor children. Finally, the termination report recommended to the circuit court that respondent's parental rights be terminated and the goal to be changed to adoption with custody and guardianship remaining with DCFS until adoption is final.

¶ 32   The circuit court conducted a hearing on the State's motion for appointment of guardian with power to consent to adoption on October 29, 2020, and November 18, 2020. At the October 29, 2020, hearing, the circuit court heard testimony from Constance Hernandez. Hernandez testified that she was a foster care supervisor, had been employed with Caritas for two years, and had handled the case involving the minor children from August 2018 until May 2019. Hernandez stated that the minor children were taken into the care of DCFS in May 2017, after respondent was arrested and left the minor children in the care of a sex offender. According to Hernandez, respondent was incarcerated for 3½ weeks.

¶ 33   Hernandez stated that she was aware of the service plan given to respondent at the initiation of this case in May 2017, and that the initial plan was basically the same plan Hernandez presented to respondent when Hernandez assumed the case in August 2018. Hernandez acknowledged that she had tendered a report to the circuit court on April 23, 2019, and that respondent's service plan at that time required respondent to address substance abuse, mental health, and parenting education and to comply with all

17

recommendations which resulted from any of the evaluations. Hernandez stated that respondent's service plan also required respondent to cooperate with Caritas, obtain gainful and legal employment, obtain and maintain housing, and comply with the legal directives regarding her offense for the possession of methamphetamine.

¶ 34 Concerning respondent's compliance with her substance abuse task, Hernandez stated that respondent did complete a substance abuse assessment which recommended that respondent participate in outpatient treatment, but that respondent failed to complete her outpatient treatment and was unsuccessfully discharged. Hernandez also stated that respondent failed to cooperate with Caritas's requests to sign releases for the agency to obtain the records relating to any substance abuse services and that from August 29, 2018, to April 9, 2019, respondent completed only one out of three requested drug tests.

¶ 35 Hernandez testified that respondent did complete a mental health assessment but failed to follow through with the recommendations. Hernandez stated that respondent did not obtain permanent housing while Hernandez was involved with the case and was rated unsatisfactory on that task. Hernandez further testified that respondent failed to complete her parenting education and was discharged unsuccessful from that program. Concerning employment, Hernandez stated that there were two occasions that respondent reported as being employed. Once in October 2018, respondent reported to Hernandez that respondent had been fired from her employment for missing too much work, and then in December 2018, respondent reported that she was working for a disabled person but would not provide Hernandez with the name of the individual or any documentation regarding the employment. According to Hernandez's testimony, the only task

respondent completed during the period of August 2018 to April 2019 was the legal aspect in that respondent was following all of the requirements of her probation.

¶ 36    Hernandez further testified that respondent's pattern in visitation with the minor children during this period was that it was common for respondent to be late. Hernandez also stated that in March 2018, respondent's visits with S.S. were stopped due to increased behavioral issues, such as wetting the bed, eating hot dogs and corn dogs as if she was giving a man a "blowjob," and masturbating, before and after visitation. Hernandez also testified that whenever S.S.'s counselor would bring up visitation, S.S. would disassociate and start talking and acting like a cat. As such, Hernandez stated that the circuit court issued an order in November 2018, directing no visitation between S.S. and respondent. Hernandez also testified that J.S. would exhibit problematic behavior, such as yelling and screaming, the day before visitation, the day of the visitation, and a day or two after visitation.

¶ 37    The circuit court continued the hearing on the State's motion for appointment of guardian with power to consent to adoption to November 18, 2020. At the November 18, 2020, hearing, Melissa Towns was called to testify on behalf of the State. Towns testified that she was employed by Caritas as a caseworker and was the author of the termination report filed with the circuit court on October 20, 2020. Towns stated that the last service plan provided to respondent was in April 2020, and that the service plan required respondent to complete mental health, substance abuse, housing, visitation, cooperation with the agency, parenting, employment, and refrain from criminal activities.

¶ 38 Concerning substance abuse, Towns testified that respondent was unsuccessfully discharged in 2017 from substance abuse treatment, had not reengaged in substance abuse services, and was rated unsatisfactory in substance abuse. Towns stated that respondent was required to be drug tested and that the last time respondent was drug tested was on November 11, 2020, at which time respondent tested positive for THC. Towns also stated that part of the reason this case involved contact with the legal system was due to respondent being charged with possession of methamphetamine.

¶ 39 Towns next testified that respondent was tasked with participating in and successfully completing a parenting class. According to Towns's testimony, respondent had not engaged in parenting education in 2017, but had completed a parenting class on October 14, 2020. Towns stated that prior to March 2, 2020, when the circuit court changed the goal of permanency to substitute care pending termination in this matter, respondent had not made any satisfactory effort to meet her parenting goal and was therefore rated unsatisfactory in her parenting education.

¶ 40 Towns also stated that respondent was unsatisfactory in her services regarding mental health. Towns testified that respondent was unsuccessfully discharged in May 2019 from her mental health services and did not reengage in mental health services until May 2020, two months after the change in the permanency goal. Towns also stated that, although respondent had reengaged in mental health services, respondent had not completed her mental health services and was rated unsatisfactory regarding her mental health services.

20

¶ 41　Concerning housing, Towns testified that respondent was residing in her deceased mother's home, but that Towns had not personally inspected the residence. Based upon prior reports concerning the residence, Towns stated that the children did not have a place to sleep and there were bolts and locks on doors that the respondent refused to open. Towns further testified that she was not aware of whether respondent was currently employed, but that respondent had not requested any assistance in applying for any public aid services. Towns also testified that respondent never requested any assistance with transportation to substance abuse services, mental health services, or parenting education.

¶ 42　Towns went on to testify that respondent's supervised visitation with R.T. and J.S. had been reduced from two hours to one hour per month after the permanency goal change in March 2020. Towns stated that, since March 2020, respondent had four visits, but acknowledged that some of the visits were suspended during COVID. Prior to March 2020, Towns testified that respondent had two hours per week of supervised visitation. Towns stated that, since October 2019, respondent could have had 25 visitations but only attended, either in person or virtual, 10 times. Towns also stated that the supervised visits did not include S.S., by court order, since 2018. Towns further testified that respondent was prohibited from sending S.S. written exchanges, such as letters or birthday cards.

¶ 43　Towns testified that respondent had not been involved in any of the minor children's educational or medical needs, except one medical clinical intervention procedure, but stated that respondent did participate in the minor children's academic case reviews conducted by Caritas during which all of the service plans for the children were covered. Towns acknowledged that, regarding S.S., an academic case review would

be the only educational activity in which respondent would be permitted to participate. Towns testified that, to her knowledge, respondent never contacted Caritas to request assistance in restoring visitation with S.S.

¶ 44    Towns stated that there had been 10 caseworkers assigned to this matter in a period of three years and acknowledged that it would be difficult to maintain any degree of stability in a service plan with that many caseworkers. Towns stated that respondent did successfully complete her probation for the methamphetamine charge and that respondent had no pending criminal charges that she was aware of since respondent paid restitution and the matter in Randolph County had been dismissed.

¶ 45    Next, respondent testified on her own behalf. Respondent stated that she was the mother of the minor children and was aware of the service plan for the last 3½ years. Respondent, however, testified that she had difficulty early on in complying with the terms of the service plan. Respondent stated that she had completed her mental health services since she had started mental health 20 years ago and was faithfully going to her doctor and participating in counseling once a week. Respondent stated she had undergone a mental health assessment as required by the service plan and that the assessment recommended counseling for six weeks. Respondent stated that she had complied with that and had been in counseling, "on-and-off," since the beginning of the case. Respondent testified that it was "on-and-off" since there was period when her mother died, and she was not permitted to visit the minor children for 15 weeks, so she rebelled against everything. Respondent stated that she was still in mental health services and had been consistently attending weekly counseling since May 2020. Respondent testified that

she believed that she had complied with the service plan's requirements for mental health services.

¶ 46   Concerning substance abuse, respondent testified that it was recommended that she attend one hour a week outpatient services for six weeks, and instead, respondent stated that she participated in a 28-day inpatient treatment program from July 2017 to August 23, 2017. Respondent stated that she had successfully completed the inpatient program, but that the program required 114 hours of outpatient follow-up. Respondent stated she did all but 14 hours of the outpatient follow-up but stopped in October 2017. Respondent stated she went back to the outpatient follow-up in February 2018 and completed the 14 hours. Respondent testified that she had also participated in almost weekly drug testing that had been negative for everything except marijuana. Respondent acknowledged that she uses marijuana and that she never discussed her marijuana use with her caseworker.

¶ 47   Respondent went on to testify that she completed her parenting education in October 2020, but also noted that a parenting class was part of her inpatient drug services, so she believed that she had also completed her parenting education in 2017. Respondent testified that she was not permitted to visit her daughter by court order and that she had missed some visitations with her sons because of miscommunication with the caseworker. Respondent stated that she currently resided with her brother in a clean, safe home with a basement and three bedrooms. Respondent stated that her brother was mildly retarded with alcohol syndrome and liver disease and that his disability paid the mortgage on the home. Respondent also testified that she assisted her brother with his

health needs. Respondent stated that she would love to have her three children come home and live with her.

¶ 48 Respondent acknowledged that she was unemployed and had been unemployed since December 2019, but stated she was getting paid to babysit a neighbor's children. Respondent stated that, for the most part, her medical health was okay but that she was currently being tested for breast cancer and that she had a thyroid disease and COPD. Respondent also stated that she had been taking antipsychotic sleeping pills, antidepressant medication, and anxiety medication for 20 years. Respondent testified that she saw her doctor monthly.

¶ 49 Respondent testified that she had no criminal problems, other than a pending traffic ticket, since the matter in Randolph County had been resolved and that she had completed her probation in St. Clair County. Respondent stated that she believed she had acted in good faith with Caritas and that Caritas did not act in good faith with her because she was being labeled unsuccessful for services that she believed she completed, and no one would explain why she could not see S.S. or why S.S. was being medically neglected. According to respondent's testimony, S.S. has a genetic neurological disorder, neurofibromatosis, that required S.S. to be seen by five doctors and not just the eye doctor. Respondent stated that she believed S.S. to be medically neglected since S.S. had not been to the Cardinal Glennon neurofibromatosis clinic in three years. Respondent acknowledged that she had not seen S.S. since March 2018, and that she had not been permitted to participate in S.S.'s medical care. Respondent also testified that a critical decision was made to terminate her visitation with all three children but that she had no

idea of why that was done. Respondent believed that the foster parents and counselor coached S.S. into lying.

¶ 50 Respondent acknowledged that the service plan given to her in April 2020 stated that she needed to complete substance abuse services and that respondent was discharged unsuccessfully. Respondent, however, stated that was for outpatient services and that she had successfully completed inpatient services. Respondent also testified that, although the service plan stated she did not complete mental health services, she had been continuing with mental health counseling through her primary care doctor since 2017. Respondent stated that the unsuccessful discharge from mental health services in May of 2019 was for outpatient services and that respondent believed that her regular mental health counseling was to ensure that she continued taking her medication. Respondent testified that she had always stayed on her medication. Respondent acknowledged that she has no certificate of completion indicating that she completed the mental health services; however, she stated she was still participating in mental health services and had received a certificate of growth.[5] Respondent also acknowledged that she had no other certificates, including certificates of completion, for the services rated unsatisfactory on her service plan.

¶ 51 Upon completion of the hearing on the State's motion for the appointment of guardian with power to consent to adoption, the circuit court took the matter under

_____

[5]The certificate of growth was admitted by the circuit court as respondent's exhibit 4, and according to respondent's testimony, the certificate was given to her by her mental health counselor. The certificate of growth states that, "Earning this certificate means you have learned that together with others, Honesty, Open Mindedness and Willingness will help you change your life, make your dreams come true and fulfill promises." The certificate of growth has the signature of 12 individuals who, according to respondent's testimony, were other patients or counselors in her mental health treatment program.

25

advisement. On January 14, 2021, the circuit court issued a written fitness order. In its written fitness order, the circuit court made the following relevant findings:

"4. Respondent Mother, Jodie [T.], appeared before this Court on August 31, 2017 at the Adjudication Hearing and stipulated to and admitted to the allegations in the Petition for Adjudication of Wardship, in that, she had an unaddressed controlled substance addiction issue, admitted to using methamphetamines, admitted to being incarcerated for possession of methamphetamine at the time that the children were taken into protective custody and admitted to having left the children in the care of a person whom with she admitted to using methamphetamines.

5. Respondent Mother, Jodie [T.], although having appeared at all five (5) of the Permanency Review Hearings held in this case, failed to make reasonable progress towards the return of the children within nine (9) months after the adjudication of abuse/neglect herein; failed to make substantial progress toward the return of the children in any of the six (6) periods of time between the permanency review hearings held over the years from March 2018 through September 2020 and including the time up to the filing of the termination petition on September 14, 2020; failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the minor children and failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor children.

6. Respondent Mother, Jodie [T.], attended less than one-half (1/2) of all visitations scheduled for her with the children over the past three (3) years and five (5) months of the pendency of this case and at this time her visitation remains supervised by DCFS. Respondent Mother's visitation with her daughter was terminated by this Court near the onset of this case and her visitation rights were never reinstated as to her daughter.

7. The children at issue in this case are special needs children, both medically and educationally, and Respondent Mother, Jodie [T.], failed to attend special needs appointments for the children, including their IEPs and medical and doctor appointments, over the pendency of this case.

8. Respondent Mother, Jodie [T.], failed to make substantial and satisfactory progress over the course of the past three (3) years and five (5) months to reunite with the children; maintain phone or written contact with them, secure gainful employment to support them or to obtain safe and proper housing for them to reside in with considerations and provisions being made to accommodate their special needs.

Based upon the evidence before the Court, the Court finds by clear and convincing evidence that:

A. Respondent Mother failed to make reasonable progress toward the return of the children to the parent during any nine (9) months period following the adjudication of abuse or neglect, specifically from August 31, 2017 through the date of the filing of the termination petition herein.

27

B. Respondent Mother failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the parent during any nine (9) month period following the adjudication of abuse or neglect, specifically from August 31, 2017 through the date of the filing of the termination petition herein.

C. Respondent Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children.

Based upon the foregoing, the COURT FINDS BY CLEAR AND CONVINCING EVIDENCE THAT the Mother, Jodie [T.], is unfit within the meaning of 750 ILCS 50.1.D."

¶ 52 On February 25, 2021, the circuit court conducted a best interest hearing and four witnesses testified at the hearing. The State again called Melissa Towns. Towns testified that she had been working in the child welfare arena for 7½ years and had been working with the minor children and respondent for 13 months. Towns testified that the minor children had been in protective custody since May 2017 and had been placed together in foster care since May 18, 2017. Since being placed in foster care, Towns testified that she had visited and observed the minor children and their foster parents, Anslea and Kyle H., three times a month. Towns stated that the foster home was a six-bedroom house and that the house was tidy. Towns testified that the foster parents had four biological children who were also in the home and that the minor children interacted with the biological children in normal sibling behaviors.

28

¶ 53    Towns stated that the foster parents had been tending to the children's educational needs, including participation in the individual educational plans for the special educational needs of two of the minor children. Towns testified that respondent had not participated in the individual educational plans or any of the children's educational needs since she had been assigned to the case. Towns also testified that the minor children were special needs children meaning that they needed more counseling and took psychotropic medications which required the foster parents to take a specialized training. Towns stated that two of the minor children were in trauma counseling and that the foster parents ensured the minor children received the counseling they required.

¶ 54    Towns further testified that the foster parents had provided the physical safety, food, shelter, and clothing for the minor children. Towns stated that the minor children had a strong bond with their foster family and were attached to the foster parents and their siblings in the home. According to Towns, she had observed a loving parental/child relationship between the foster parents and the minor children and believed that it was in the children's best interest that they remain placed with the foster parents. Towns also stated that if the minor children would become available for adoption, it would be in the best interest of the minor children that the foster parents adopt the minor children. Towns testified that it was her belief that it would traumatize the minor children to be removed from the foster parents' home.

¶ 55    On cross-examination, Towns testified that respondent had not participated in any of the children's special educational needs because she was prohibited from attending the meetings. As such, even if respondent had wanted to attend, Towns stated that respondent

would have been denied. Towns stated, however, that if respondent wanted to know about the children's education, respondent could have asked.

¶ 56    Towns also acknowledged that respondent had not seen S.S. in about two years due to a court order prohibiting contact. The court order was based upon a critical decision made by S.S.'s counsel regarding the sexual abuse of S.S. and that S.S. had completed her sexualized trauma counseling and was no longer receiving counseling at the time of the hearing. Towns, however, also stated that both R.T. and J.S. were still receiving trauma counseling and had been receiving counseling for 3½ years due to behavior issues. Further, Towns testified that the children were receiving psychotropic medications based on their diagnosis of ADHD[6] and PTSD.[7]

¶ 57    Towns also stated that the foster parents receive approximately $3000 a month for caring for the minor children and will continue to receive that amount if they adopt the minor children. Towns acknowledged that two of her monthly visits to the foster home were done virtually and that she only visited the foster home in person once a month due to COVID. Finally, Towns testified that she believed that respondent loved her children.

¶ 58    The State then called Kyle H. to testify. Kyle stated that he was an engineer employed by Southeastern Illinois Electric and that he and his wife had four biological

---

[6]"Attention-deficit/hyperactivity disorder (ADHD) is a brain disorder marked by an ongoing pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development." https://www.nimh.nin.gov/health/topics/attention-deficit-hyperactivity-disorder-adhd (last visited July 26, 2021).

[7]Post-traumatic stress disorder (PTSD) is a mental health condition that develops following a traumatic event characterized by intrusive thoughts about the incident, recurrent distress, anxiety, flashbacks, and avoidance of similar situations which affect the normal life and functioning of an individual. https://www.cdc.gov/childrensmentalhealth/ptsd (last visited July 26, 2021).

children and three foster children. Kyle stated that they lived in a six-bedroom, ranch style home in which his daughter and S.S. have their own rooms, his two boys share a bedroom, R.T. and J.S. share a bedroom, and there was a bedroom for the baby. Kyle stated that the home had been inspected by DCFS and Caritas and no improvements were recommended.

¶ 59 Kyle stated that his wife was a stay-at-home mom and that the minor children had been with them for 3½ years. Kyle stated that he and his wife had been responsible for providing for the minor children's daily needs, including food and clothing. Kyle testified that, initially, he received around $900 per month, but as the minor children were designated specialized, the amount increased, and he now receives $3700 a month in financial assistance. Kyle stated that he was not reliant on the financial assistance and that the financial assistance was not part of the reason that he was fostering the minor children. Kyle further testified that he had not received any financial assistance from respondent during the 3½ years he had the minor children and that respondent had never provided the minor children with clothing or personal care items.

¶ 60 Kyle stated that when they first received the minor children, it was a normal foster placement until the minor children were designated as specialized. As such, Kyle stated that he took the training needed to be able to provide a specialized foster home so that the minor children could remain with him. Kyle further testified that all the minor children had special needs and that he and his wife ensured that the children's special education and medical needs were met including taking the children to their counseling and medical appointments. Kyle state that respondent had never gone to any medical appointment for

the minor children and never inquired about the children's medical needs over the past 3½ years.

¶ 61    Kyle stated that the minor children have friends in their school and have participated in sports through the park district. According to Kyle's testimony, R.T. had tried baseball, but for the most part, R.T. was not a sports guy, but that J.S. played baseball and soccer, and S.S. had played softball, soccer, and participated in gymnastics. Kyle stated that the family, including the minor children, attended church and that he was a Sunday school leader. Kyle testified that the minor children had friends at church.

¶ 62    Regarding his relationships with the minor children, Kyle testified as follows:

"I would say with [R.T.] those first couple years he was a little more, you know, laid back in it, but being involved with him and watching him grow as a man, he's really—he's really been a joy to have. I have a very good relationship with [R.T.]. With [J.S.], he's the funny character out of the group, so yeah, he's—I love him to death. He's a good kid. And then [S.S.], I mean, she's the energizer bunny, so she's—she's the soccer player for sure. I've coached her soccer team for the last three years, so it's been wonderful."

¶ 63    Kyle stated that the minor children call him "dad" and he would consider it an honor to be able to adopt them. On cross-examination, Kyle stated that he has talked to the minor children regarding their father and that it was not his intention to adopt the minor children when he first began to foster them, but that he and wife came to the decision to adopt within the last year. Kyle admitted that he never informed respondent

about the minor children's activities schedules, so she would not have had an opportunity to come and watch the games.

¶ 64 As its last witness, the State called Anslea H. to testify. Anslea stated that she is the wife of Kyle and that, if the minor children were to become available for adoption, she would be willing to adopt them. Anslea testified that the minor children have specialized healthcare needs and that she was the individual who primarily took the minor children to their appointments. She also stated that she helped the minor children get ready for school, assisted them with their homework, and ensured the minor children received their medication. Anslea testified that she and her husband, over the last 3½ years, had been responsible for the minor children's everyday food, shelter, safety, and overall welfare. Anslea stated that the family took two to four vacations a year such as Holiday World once a year and short, little experience trips, like going to Louisville for the weekend. Anslea testified that she had a mother-child relationship with the minor children and that they were extremely bonded together.

¶ 65 The State did not call any further witnesses and respondent was the only witnesses called on her behalf. Respondent testified that she was the mother of the minor children and that she was permitted to visit with R.T. and J.S. for one hour once a month at a DCFS office. Respondent stated that she had not seen S.S. in three years and that she was not allowed to participate in any of the minor children's education. Respondent stated that Towns had been her caseworker for a little over a year and that there had been at least seven caseworkers assigned in this matter.

¶ 66 Respondent stated that she had just received a new service plan from Caritas the previous day and that she had several prior service plans. Respondent testified that she had completed all the services on her service plan except for mental health counseling which she was still attending. Respondent stated that she was currently residing in her mother's home with her brother who makes the payments. Respondent testified that her brother was mildly mentally retarded and had learning and behavior disabilities. Respondent stated that her brother received $1161 a month in social security benefits and that he made the house payments from that amount. Respondent testified that she was not currently employed and had not been employed since December 2019.

¶ 67 Respondent stated that if she regained custody of the minor children, her goal would be to bring them to her mother's home and the minor children would go to school in Steeleville. Respondent testified that she would be able to ensure the minor children received their prescribed medication and that she was an able and fit person to take care of the minor children. Respondent stated that she loved the minor children "more than life" and that it would not be in the minor children's best interests to terminate her parental rights. Respondent stated that she had made inquiries regarding the minor children's medical health and education, but she was never informed of anything. Respondent also testified that she was never informed of any of the minor children's activities.

¶ 68 On cross-examination, respondent stated that she had, on several occasions, discussed with her attorney about bringing a motion on her behalf to get visitation with S.S. but that "it couldn't be ruled until it took the nine months for the investigation to be

ruled unfounded." Concerning her employment status, respondent testified that she had not had a job since 2019 but had been attempting to gain employment, which was difficult at that time because she had been the victim of identity theft. Respondent testified that she buys food for herself with Link, and that she receives food stamps and assistance with medical costs. Respondent stated that she has a vehicle and gets money for gas by babysitting, dog walking, and taking care of her uncle.

¶ 69    Upon completion of the best interest hearing, the circuit court found as follows:

> "Well, based on the testimony that the Court has heard together with the report that was prepared by Caritas for the purpose of this hearing, the Court finds that the nature and length of these children's relationship with their present caretakers and the effect that a change in placement would have on their emotional and psychological well being leaves the Court to find that it is in the best interest of the children that their—the parental rights of the parent be terminated."

¶ 70    The circuit court entered a written order the same day, February 25, 2021, finding that it was in the best interest of the minor children and the public that all residual, natural, parental rights and responsibilities of the respondent be terminated. As such, the circuit court ordered the termination of respondent's parental rights and responsibilities and appointed DCFS as guardian of the minor children with authority to consent to the adoption of the minor children without further notice or consent by respondent.

¶ 71    The respondent now appeals arguing that the State failed to prove that respondent did not make reasonable progress towards the return of the minor children during any

nine-month period following the adjudication of abuse or neglect. Respondent also argues that the circuit court erred in finding that respondent had not made reasonable efforts to correct the conditions that were the basis for the removal of the minor children and further erred in finding that respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children.

¶ 72                                    II. ANALYSIS

¶ 73    "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28. The Act (705 ILCS 405/1-1 *et seq.* (West 2020)), along with the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)), governs the proceedings for the termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). The Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). Even if the State alleges more than one count of unfitness, only one count needs to be proven to find a parent unfit. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28.

¶ 74    In this appeal, respondent raises no issues regarding the circuit court's finding that termination of respondent's parental rights was in the best interest of the minor children.

Respondent argues, however, that the circuit court erred in finding respondent an unfit person based upon its determination that respondent did not make reasonable progress towards the return of the minor children during any nine-month period following the adjudication of abuse or neglect. Respondent also argues that the circuit court erred in finding that respondent had not made reasonable efforts to correct the conditions that were the basis for the removal of the minor children and erred in finding that respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children.

¶ 75   We will focus on reasonable progress in this matter, as it is dispositive to respondent's claim that the court erred in finding her unfit. Respondent argues that there is evidence of "demonstrable movement" towards the return of the minor children following the nine-month period following the adjudication of neglect, including the nine-month period commencing December 14, 2019, and ending September 14, 2020. Respondent cites to her testimony at the fitness hearing wherein she testified that she was still participating in mental health counseling and had been "consistently in counseling since May of 2020." Respondent also cites to her testimony to demonstrate that she had successfully completed inpatient substance abuse services and believed that her outpatient requirement of 114 hours was completed in February 2018. Respondent also argues that the evidence at the fitness hearing demonstrated that her random drug tests were negative for any illicit or illegal substances except marijuana and that her caseworker had failed to inform her that testing positive for THC would be viewed as negative or result in an unsatisfactory rating on her substance abuse service plan.

¶ 76　Respondent further argues that she had provided evidence at the fitness hearing of her completion of parenting education in October 2020. Respondent also states that she testified at the fitness hearing that it was difficult to maintain a steady and open relationship with the service providers because 10 caseworkers had been assigned and notes that Towns acknowledged in her testimony that 10 caseworks were problematic. Respondent argues that she testified at the fitness hearing regarding the visitations with the minor children and the poor communication between respondent and her caseworkers that resulted in some visitations being cancelled. Respondent argues that Towns's direct testimony at the fitness hearing demonstrated that respondent had exercised visitation with the minor children 58% of the time that it was offered to her. Respondent further argues that her testimony demonstrated that she was living in a nice, clean, safe, and stable home and that she had an income from babysitting and was still seeking other employment. Respondent also notes that, other than Towns's testimony, the State failed to present an expert at the fitness hearing to demonstrate that all three of the minor children had special needs.

¶ 77　Respondent argues that she did everything to the best of her ability during the relevant time period to cooperate with Caritas and facilitate progress in her service plan. It is respondent's argument on appeal that, "[b]ased upon these examples of minimum measurable or demonstrable movement the trial court['s] ruling of no reasonable effort during the relevant nine[-]month period is against the manifest weight of the evidence."

¶ 78　Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) provides for finding a parent unfit where the parent has failed to make reasonable

progress towards the return of the child during any nine-month period following the adjudication of neglect. *In re J.A.*, 316 Ill. App. 3d at 564. The State bears the burden of proving by clear and convincing evidence that the parent is unfit, and we may affirm if the evidence supports a finding of unfitness on any one of the alleged statutory grounds. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28.

¶ 79 Reasonable progress is an objective standard that focuses upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. Measuring reasonable progress under section 1(D)(m)(ii) of the Adoption Act encompasses the parent's compliance with the service plans in light of the conditions giving rise to the removal of the minor child, while also considering other conditions which may later arise preventing the return of the child to the parent. *Id*. A parent's failure to substantially fulfill his or her obligations under the service plan is substantially a parent's failure to make reasonable progress toward the return of the minor child. *Id.*

¶ 80 Further, a determination of parental unfitness involves factual findings and credibility assessments that the circuit court is in the best position to make, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, and not based on the evidence." *Id*. at 890.

39

¶ 81    In this matter, we find that the circuit court's finding that respondent had not made reasonable progress toward the return of the minor children during any nine-month period following the adjudication of neglect is supported by the manifest weight of the evidence. Although respondent states that the relevant nine-month time period is December 14, 2019, to September 14, 2020, whether a parent has made reasonable progress may be examined in light of any nine-month period following the expiration of the first nine months after the adjudication of neglect (*id.* at 891), and this court may affirm the circuit court's judgment on any basis established by the record (*In re K.B.*, 314 Ill. App. 3d 739, 751 (2000)).

¶ 82    Respondent testified at the hearing, and argues on appeal, that she had completed her substance abuse services in 2018, but respondent failed to provide a certificate of completion to her caseworker or information on which her caseworker could verify her compliance in the two years respondent claims to have completed the task. Respondent's argument that her caseworker failed to inform her that testing positive for marijuana would result in an unsatisfactory rating is also unpersuasive since respondent had received an unsatisfactory rating on all of her service plans and could have inquired why the rating remained unsatisfactory if she believed that she had completed her substance abuse services. Further, the circuit court's dispositional order of October 5, 2017, directed respondent to refrain from the use of all mood or mind-altering substances, including cannabis, unless prescribed by a licensed physician. As such, respondent was advised by the circuit court that testing positive for marijuana would have a negative effect

regardless of whether respondent's caseworkers had addressed the issue since respondent's marijuana use directly violated the circuit court's order.

¶ 83 Respondent testified that she had only consistently been in mental health counseling since May 2020 and had yet to complete her mental health services as required by her service plan. Although respondent testified at the fitness hearing that she had obtained steady, clean, and safe housing, respondent did not provide any support for her testimony. Respondent could have requested a home inspection or called witnesses to testify concerning her current living conditions. Further, respondent actively did not allow the caseworker into the padlocked rooms during the initial home inspection to demonstrate that the home was safe. Respondent further testified that she had failed to gain steady employment and respondent did not provide any evidence which would have demonstrated to the circuit court that she had made any reasonable progress towards the obtainment of employment. Respondent testified at the fitness hearing that she was babysitting but provided no documentation or a point of contact in which her caseworker could verify her income.

¶ 84 Respondent's arguments on appeal are supported solely by respondent's testimony at the circuit court's fitness hearing, and as stated above, the circuit court was in the best position to make a credibility assessment of respondent's testimony along with the testimonies of respondent's two caseworkers. Further, as noted above, reasonable progress is an objective standard that focuses upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. In this matter, respondent was permitted 3½ years from

the time the minor children were taken into DCFS's care to complete her service plan and failed to do so. Instead, respondent remained unemployed, failed to complete her mental health services, and failed to demonstrate that she could provide a safe home for the minor children.

¶ 85 Therefore, we find that the circuit court's finding that respondent was an unfit person as defined in section 1(D) of the Adoption Act based on respondent's failure to make reasonable progress toward the return of the minor children during any nine-month period following the adjudication of neglect was not contrary to the manifest weight of the evidence. As noted above, only one count of unfitness needed to be proven for the circuit court to find that respondent was an unfit person. *In re J.A.*, 316 Ill. App. 3d at 564. Because we have determined that the circuit court was correct in finding that respondent was an unfit person for failing to make reasonable progress towards the return of the minor children during any nine-month period following the adjudication of neglect, we do not need to address respondent's issues of whether the circuit court erred in finding that respondent had not made a reasonable effort to correct the conditions that were the basis for the removal of the minor children or erred in finding that respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children.

¶ 86 Based on the above, we find that the circuit court's judgment that respondent was an unfit person based upon its determination that respondent failed to make reasonable progress for the return of the minor children during any nine-month period following the adjudication of neglect was not contrary to the manifest weight of the evidence.

42

¶ 87                                    III. CONCLUSION

¶ 88    Based on the foregoing, we affirm the judgment of the circuit court.


¶ 89    Affirmed.